689 A.2d 154

FIRST AMERICAN TITLE INSURANCE COMPANY, PLAINTIFF–
APPELLANT/CROSS–RESPONDENT, v. VISION MORTGAGE
CORPORATION, INC., DEFENDANT–RESPONDENT/CROSS–
APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued November 20, 1996—Decided February 25, 1997.

Before Judges LONG, SKILLMAN and CUFF.

*Dennis M. Gonski* argued the cause for appellant/cross-respondent.

*Michael Chazkel* argued the cause for respondent/cross-appellant (*Chazkel & Associates,* attorneys; *Mr. Chazkel,* of counsel; *Jeffrey Zajac,* on the brief).

*Joseph M. Clayton, Jr.* submitted a brief amicus curiae on behalf of the New Jersey Land Title Association.

The opinion of the court was delivered by

LONG, P.J.A.D.

In August, 1989, James Saunders, a realtor, along with Kenneth J. Levenson, an attorney, and Sant P. Chima, the owner of property at 19 West Amherst St. in East Brunswick, masterminded a scheme to defraud the defendant, Vision Mortgage Corporation. They applied to Vision for a loan in the name of Gregory Zarifian to purchase Chima's house. Zarifian was unaware of the transaction.

As a result of the documents submitted establishing Zarifian's financial status (tax returns, bank statements, etc.) and an independent appraisal, Vision approved the loan. Title insurance was purchased from plaintiff, First American Title Insurance Company, which drafted and issued a "Closing Protection Letter" to Vision. The Closing Protection Letter named Levenson as the "Approved Attorney" and contained the following provision:

When title insurance of *First American Title Insurance Company* is specified for your protection in connection with closings of real estate transactions in which you are to be the lender secured by a mortgage (including any other security instrument) of an interest in land, the Company, subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for actual loss incurred by you in connection with such closings when conducted by an Issuing Agent (an agent authorized to issue title insurance for the Company) or an Approved Attorney (an attorney upon whose certification of title the Company issues title insurance) and when such loss arises out of:

. . . .

2. Fraud or dishonesty of the Issuing Agent or Approved Attorney in handling your funds or documents in connection with such closing.

On August 28, 1989, a real estate closing took place. It appears that Levenson, Saunders, and Chima were present. Chima signed a deed which conveyed the property to Gregory Zarifian in exchange for $220,000. Vision advanced $198,000 of the purchase price in exchange for a first mortgage on the property. Someone forged Zarifian's signature, and Levenson notarized the forged signature. At the closing, Vision did not have a separate attorney present in addition to Levenson, who represented First American's interests as the Approved Attorney.

On August 30, 1989, Vision assigned the mortgage to Residential Funding Corporation (RFC). Under its contract with RFC, Vision was obligated to make good on missed mortgage payments in the event of a default and to repurchase the mortgage from RFC in the event of fraud.

As might be expected, no mortgage payments were ever made, leading Vision to realize that a fraud had occurred. In a letter to First American dated November 20, 1989, Vision notified First American that the mortgage was in foreclosure, that the mortgagor was expected to raise fraud or forgery as a defense and that Vision intended to look to First American as the insurer for reimbursement. Purportedly relying on Levenson's representation that Zarifian executed the mortgage, First American took the position that the mortgage was valid and refused to reimburse Vision during the pendency of the foreclosure action. Vision sent a subsequent letter, dated March 5, 1990, informing First American that Vision had determined that the mortgage insured by

First American was a forgery and that a second appraisal of the property suggested that its foreclosure sale would not garner sufficient funds to satisfy the outstanding amount due on the mortgage.

Vision notified the prosecutor that it had been swindled. On June 6, 1990, a ninety-eight count indictment was filed against Levenson, Saunders, and Chima, among others, alleging numerous fraudulent real estate transactions. Levenson eventually pled guilty to one count of conspiracy to commit commercial bribery pursuant to *N.J.S.A.* 2C:21-10 and *N.J.S.A.* 2C:5-2. That plea did not involve this transaction. All other counts against him were dismissed. Levenson was sentenced and consented to disbarment. *In the Matter of Kenneth J. Levenson, an Attorney at Law,* 127 *N.J.* 270, 604 *A.*2d 100 (1992).

Vision again demanded reimbursement from First American by letter dated August 16, 1990. Again, First American refused, claiming that title insurance did not guarantee a mortgaged property's value.

RFC, still the mortgagee at that point, then foreclosed on the property and filed suit to have it sold. On December 19, 1991, Judge Paul Levy ordered the property to be sold and granted RFC a final judgment of default in the amount of $244,183.64, together with interest at the contract rate of 12% on $203,638.06, being the principal sum in default (including any advances, if any) from May 9, 1991 to December 19, 1991 and lawful interest thereafter on the total sum due plaintiff together with costs of this suit to be taxed including a counsel fee of $2591.84 raised and paid in the first place out of the mortgaged premises.

On May 6, 1992, RFC bought the property at a sheriff's sale and Vision repurchased the property from RFC in accordance with their agreement.

On October 28, 1992, Vision sold the property for $135,000 to Linda Sue and Bruce Garahan. In January, 1993, Vision again wrote to First American seeking reimbursement for its loss calculated as follows:

| Loan Balance | $198,000.00 |
| ESCROW DEFICIT | 9,991.63 |

| | |
|---|---:|
| INTEREST UNTIL | 63,533.67 |
| SHERIFF SALE PROPERTY DISPOSITION | 7,119.86 |
| Total Loss | $278,645.16 |
| | |
| Sales Price | $135,000.00 |
| Less SETTLEMENT CHARGES | (7,673.65) |
| Net Proceeds from Sale | $127,326.35 |
| | |
| Total Loss | $278,645.16 |
| Less Net Proceeds from Sale | (127,326.35) |
| | $151,318.81 |

The matter was not resolved and on April 11, 1994, First American filed a complaint seeking a declaratory judgment adjudicating its rights vis-á-vis Vision. Vision filed a counterclaim for breach of contract, bad faith denial of insurance coverage, and consumer fraud, seeking compensatory, consequential, punitive, and treble damages, in addition to counsel fees.

Both parties moved for summary judgment on the issue of Vision's entitlement to recovery from First American. Judge C. John Stroumtsos granted Vision's motion as to liability only and set the case down for a damages trial. Judge Joseph C. Messina presided over a bench trial after which he dismissed Vision's counterclaim for consumer fraud treble damages and punitive damages. He found that Vision's losses were related to Levenson's misconduct and awarded Vision $176,155.93 [1] in damages and $20,000 in counsel fees.

First American appeals, contending that fraud and dishonesty on the part of the Approved Attorney was not proved; that, in any event, Vision's losses did not arise out of a covered event; and that Vision did not prove its damages. Vision cross-appeals, claiming that the trial judge erred in refusing to award punitive damages; in denying recovery of treble damages under the Con-

---

[1] The difference between Vision's calculations and the final order is due to the judge's disallowance of the $1,128 insurance component of the escrow deficit and the addition of interest subsequent to the sheriff's sale pursuant to R. 4:42–11(a).

sumer Fraud Act; in calculating prejudgment interest; and in awarding an inadequate counsel fee.

■ Initially, we turn to First American's appeal. Because First American conceded the fraud of the Approved Attorney on the motion for summary judgment, it is foreclosed from arguing the contrary on this appeal. *Misani v. Ortho Pharmaceutical Corp.*, 44 *N.J.* 552, 555–56, 210 *A.*2d 609 (1965). *See State v. Atlantic City Elec. Co.*, 23 *N.J.* 259, 264, 128 *A.*2d 861 (1957) (defendant should not be permitted upon appeal to alter its interpretation of the facts upon which the issue was framed and which was legitimately relied upon by the adversary in its conduct of the case). Whatever else occurred, it is undisputed that Levenson notarized the forged signatures at least three times and took money from Vision on the pretext that it was being borrowed by Zarifian. Thus, there is no question but that there was fraud or dishonesty by the Approved Attorney in handling the closing documents and funds within the meaning of the Closing Protection Letter.

■ First American next argues that, even if Levenson's fraud was proven, Vision's loss did not arise out of an event covered by the policy. The gravamen of this argument is that the focus of the Closing Protection Letter is to secure first lien status for the lender's mortgage, backed up by a title insurance policy, and that that is exactly what Vision received. According to First American, any loss Vision sustained was the result of its overvaluation of the property in the first place. This argument has superficial appeal but will not withstand scrutiny.

To be sure, not every case in which an Approved Attorney commits a fraud and a lender sustains a loss will trigger title policy coverage under the Closing Protection Letter. For example, if an Approved Attorney notarized documents, thus falsely attesting that they were signed in his presence when this was not the case, but the signatures nonetheless were bona fide, a later loss by the lender would not be insured. The reason for this is that the lender would have received what it bargained for—a bona

fide mortgagor with the financial capacity to make the mortgage payments; a first lien on the property subject to foreclosure, if necessary; and the right to seek recovery of a deficiency after foreclosure from the mortgagor. If, despite exhaustion of these remedies, the lender still sustained a loss (for example, as a result of a real estate market trough), that loss would not be related to the Approved Attorney's misconduct and would thus fall outside the scope of the Closing Protection Letter.

That is not the case here. Here Vision did not get what it bargained for. While it is true that Vision had first lien status, despite Levenson's fraud, and that the validity of its mortgage was not affected by that fraud, this was a sham transaction from the outset. Levenson and his cohorts stole Vision's money by falsely using the name and financial credentials of Zarifian, a stranger to the transaction. This guaranteed an immediate default because there was no bona fide mortgagor to make the mortgage payments. It also eliminated the possibility of Vision recouping a foreclosure loss through a deficiency proceeding against the mortgagor. Thus, of the three remedies for which a lender bargains in a bona fide transaction (payment, foreclosure and recovery of any deficiency), only one was available to Vision (foreclosure) as a direct result of Levenson's fraud. While technically it is possible that Vision might have recouped its investment through foreclosure if it had placed a more realistic value on the property at the time of the transaction, this does not insulate First American from liability. By making Levenson an Approved Attorney, First American put him in the position to steal from Vision by creating this sham transaction. As such, Vision's losses, even those related to the careless valuation of the property, fell well within the expansive coverage of the title insurance policy. *See Sears Mortgage Corp. v. Rose,* 134 *N.J.* 326, 349–52, 634 *A.2d* 74 (1993); *Clients' Sec. Fund of the Bar of New Jersey v. Security Title and Guar. Co.,* 134 *N.J.* 358, 369–70, 634 *A.2d* 90 (1993). Here, as in those cases, the title insurance company was in the best position to prevent the loss created by the fraud and defalcation of the Approved Attorney. We thus affirm Judge Stroumtsos' grant of

summary judgment against First American. We also affirm Judge Messina's damages calculation as adequately supported by the evidence of record.

As to the cross-appeal, we affirm as to all issues presented. Judge Messina's determinations denying punitive damages as well as damages under the Consumer Fraud Act were fully supported by the record and legally unexceptionable. His calculation of prejudgment interest accorded with *R.* 4:42–11, and his award of counsel fees was well within his discretion. In sum, we have rejected all of the issues raised on the appeal and cross-appeal.

Affirmed.