739 A.2d 413 (1999)
325 N.J. Super. 298
Glen Curt REYNOLDS and Dionna M. Reynolds, Plaintiffs-Respondents, and
Guard Dogs Unlimited, Inc., Plaintiff,
v.
LANCASTER COUNTY PRISON, Defendant-Appellant, and
Ken Geib, Defendant.
Martin Abbott, Plaintiff-Respondent/ Cross-Appellant,
v.
Guard Dogs Unlimited, Inc. and Lancaster County Prison, Defendants-Appellants/ Cross-Respondents, and
Glen Reynolds, Vincent A. Guarini, Alan J. Himmelsbach And Kenneth L. Geib, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued September 21, 1999.
Decided October 27, 1999.
*417 Robert D. Kretzer, Jersey City, for defendant-appellant (Lamb, Hartung, Kretzer, Reinman & DePascale, attorneys; Mr. Kretzer, on the brief).
John R. Knodel, Edison, for defendant-appellant/cross-respondent Guard Dogs Unlimited, Inc. (Methfessel & Werbel, attorneys; Mr. Knodel, on the brief).
Mitchell B. Seidman, Roseland, for plaintiff-respondent/cross-appellant Martin Abbott (Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, attorneys; Mr. Seidman, of counsel and on the brief; Christine Fader, on the brief).
David A. Mazie, Livingston, for plaintiffs-respondents Glen Curt Reynolds and Dionna Reynolds (Nagel, Rice & Dreifuss, attorneys; Mr. Mazie, of counsel and on the brief; Randee M. Matloff, on the brief).
Before Judges PETRELLA, BRAITHWAITE and COBURN. *414 *415
*416 The opinion of the court was delivered by COBURN, J.A.D.
The primary defendant in these consolidated dog-bite cases is Lancaster County Prison ("LCP"), a Pennsylvania public entity. During the fourteen months it owned Diesel, a 134-pound Rottweiler trained as an attack dog for prisoner control, the dog bit prison guards on five separate occasions. Despite Diesel's demonstrated propensity for unprovoked attacks on humans, LCP brought Diesel to New Jersey and gave him to defendant Guard Dogs Unlimited, Inc., a New Jersey corporation ("Guard Dogs"). LCP did not disclose Diesel's vicious disposition.
Within a month, Diesel attacked and bit plaintiff Martin Abbott, an independent contractor working for Guard Dogs in New Jersey. And less than a month later, again in New Jersey, Diesel attacked and bit the principal of Guard Dogs, plaintiff Glen Curt Reynolds. Neither attack was provoked; both were savage, sudden and unexpected, and the plaintiffs suffered grievous personal injuries.
The cases were tried together to a jury. The jury rejected a claim of fraud but found LCP liable to plaintiffs for the tort of negligent misrepresentation involving risk of physical harm. It also found Guard Dogs liable to Abbott under the dog-bite statute, N.J.S.A. 4:19-16, and because Guard Dogs had negligently failed to discover and disclose to Abbott the dog's history. In Abbott's case, the jury assessed comparative fault at 85% for LCP and 15% for Guard Dogs. In Reynolds' case, the jury assessed comparative fault at 75% for LCP and 25% for Mr. Reynolds. The jury assessed Abbott's damages at $1,500,000, Mr. Reynolds' damages at $1,400,000, and Mrs. Reynolds' damages for her per quod claim at $250,000. Following an assortment of post-trial motions, which were all denied by the trial court, and a molding of the verdicts to reflect the comparisons of fault, judgment was entered.[1] We affirm.
Defendant LCP appealed based on the following contentions: (1) it was entitled to a directed verdict because plaintiffs failed to prove the tort of negligent misrepresentation *418 and because of the immunity allegedly provided by the Political Subdivision Tort Claims Act of Pennsylvania ("PSTCA"); (2) it was entitled to application of the $500,000 damages-cap of the PSTCA; and (3) it was entitled to a new trial because the verdicts were excessive and because the trial court erred in the admission of certain evidence and in its charge on that evidence.
Defendant Guard Dogs also appealed. It contends that (1) Abbott was not entitled to recover because of his status as an independent contractor; (2) the trial court's charge on the independent contractor defense was erroneous; (3) the court erred in failing to charge assumption of the risk; (4) the liability verdict was against the weight of the evidence; and (5) the damage award was excessive.
Plaintiff Abbott filed a cross-appeal in which he argues (1) under the dog-bite statute he was entitled to a judgment permitting him to seek 100% of his damages from Guard Dogs; and (2) under the Offer of Judgment Rule, R. 4:58, he was entitled to reimbursement from Guard Dogs for his attorney's fees and expenses, plus interest.
As a preliminary matter, we take note of our obligation "to accept as true all evidence supporting the jury's verdict and to draw all reasonable inferences in its favor wherever reasonable minds could differ." Harper-Lawrence, Inc. v. United Merchants & Mfrs., Inc., 261 N.J.Super. 554, 559, 619 A.2d 623 (App.Div.) certif. denied, 134 N.J. 478, 634 A.2d 525 (1993) (citing Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969)). With that principle in mind, these are the facts bearing on liability.

I
LCP, a public entity of the Commonwealth of Pennsylvania, is a maximum security prison. In 1994 and 1995, its correction officers used trained attack dogs to assist in controlling the prisoners. By early March 1994, the prison had obtained a 134-pound Rottweiler named Diesel. The dog was assigned for training to Corrections Officer Kenneth Geib. By August, although the dog was still in training, Geib began to use him for prisoner control. Over the next nine months, Geib and Diesel participated in numerous situations involving prisoner violence. In each instance, the dog performed properly, but he was involved in five other incidents in which he bit corrections officers.
The first incident occurred a few days after Diesel arrived at the prison. During a training session, when Geib pulled on the dog's leash to stop him from barking at another dog, he turned and bit Geib on the finger. The second incident occurred in June 1994, when Diesel was being trained by another officer, Robert Barley. When Barley pulled on the leash to correct poor behavior, the dog jumped him, biting the clothing covering his chest and then his arm.
The remaining incidents all involved Geib. On October 6, 1994, Diesel bit Geib on both arms during a training session. On April 20, 1995, Geib noticed that Diesel and another dog were "barking and going nuts on each other" and he "called him to come back in his run...." Diesel jumped on him and "[t]hen he came back up and he bit me in my left arm...." The fifth incident occurred on April 28, 1995. Geib found Diesel facing another dog that was on the other side of a screen. When Geib reached down to pull Diesel away, the dog "spun around and he did immediately bite me in my arm."
After each bite, Geib submitted to his supervisor an "Unusual Activity Report." After the last attack, Geib included within his report a recommendation to get rid of Diesel. He wrote: "Based on my experience as handler, I feel there is an irreversible medical problem with K-9 Diesel and recommend K-9 Diesel be removed from the program." On the bottom of that form, Geib's supervising officer, Sergeant Alan Himmelsbach, wrote that he agreed with Geib and that "K-9 Diesel is a Liability! Suggest K-9 Diesel Be Put Down."
*419 Guard Dogs, a New Jersey corporation, owned about fifty guard dogs which it rented to businesses to secure their premises at night. During the day, the dogs were either kept in kennels at various locations in New Jersey, or were maintained by Guard Dogs in kennels located on customers' premises. At night, the dogs were either brought to the customers' premises or, if kept there, were released for patrol. In the morning, the handlers returned the dogs to their kennels, fed them, and cleaned the premises. Guard Dogs also rented the second floor of a warehouse in Newark where it kept supplies and had a single kennel.
Reynolds, an experienced dog trainer, decided to employ Abbott in early 1994 as an independent contractor to assemble kennels, cover the tops of outdoor kennels with roofing, and to perform other odd jobs. Later in 1994, Reynolds trained Abbott to handle dogs. Soon Abbott became Reynolds' "right-hand man." Confident in Abbott's abilities to run the company's daily operations, Reynolds moved to Maine but kept a residence in New Jersey. Although Reynolds maintained daily contact with Abbott and continued to supervise the business, Abbott took on the responsibility of supervising the other dog handlers and maintaining the kennels and dog houses.
In late April or within the first few days of May 1995, Sergeant Himmelsbach decided to offer Diesel to Guard Dogs. When he spoke to Reynolds by telephone, he said that the prison had a dog that needed to be placed and immediately referred Reynolds to Geib. According to Reynolds' testimony, Geib told him that Diesel had become increasingly aggressive toward other dogs and, as a result, was unsuitable for the prison. Geib added that the dog had been "very well trained. He had been through obedience and protection training as well as agility training" and had been "certified." Reynolds asked for "a rundown on what the problems were and just any details that he thought would be important for us to know." He also asked if the dog had ever bitten anyone. Geib replied that on one occasion, when he was breaking up a dog fight, Diesel "nipped" him. Geib's testimony confirmed Reynolds' description of this conversation.
Shortly thereafter, at Reynolds' direction, Abbott arranged to meet Geib on May 6, 1995, at Exit 6 of the New Jersey Turnpike, to take possession of Diesel. When they met, Geib told Abbott that the dog was tranquilized because he did not "travel well." He said the dog was friendly toward people. He emphasized the point by adding that sometimes the dog was shown to prison visitors, and that on one occasion the dog had approached a woman visitor and had leaned against her leg. Abbott admitted that Geib also told him of an incident in which he was nipped by the dog and showed him a small, stitched wound on his arm. According to Abbott, Geib explained that he received the bite while breaking up a dog fight. The dog was placed in a crate in Abbott's truck, and Geib concluded the transaction by handing Abbott a sealed manilla envelope containing Diesel's certificates and his veterinary record.
Although Reynolds was unsure about when he looked at the contents of the manilla envelope, it was definitely after the attack on Abbott. The veterinarian's record revealed one of the earlier attacks by Diesel. Reynolds testified that had he known about the five attacks, he would not have accepted the dog. He also said that had he known that the dog had two attacks on people within eight days before the day of the transfer, he absolutely would not have accepted the dog.
Abbott brought Diesel to the Newark warehouse and placed him in the kennel. In accordance with Reynolds' instructions, Abbott began to bond with Diesel in preparation for becoming his handler. During the first two weeks, that process involved feeding, watering, talking to, and just being around the dog. Later, he exercised the dog by walking him around the warehouse floor, and on at least one occasion *420 he took the dog with him for a ride in his truck.
On the morning of May 31, 1995, Abbott cleaned Diesel's kennel, fed and watered him, latched the kennel gate, and left to perform other duties. Around 3:00 p.m., Abbott returned to the warehouse to pick up some tools. As he started gathering the tools, he sensed that something was behind him. Turning, he saw Diesel standing outside his kennel. The dog rushed him, bit down on his arm, and would not let go. Abbott described the attack:
I felt the teeth sink in my arm and I tried to ... pull my arm out of the dog's mouth, but he just kept biting down harder.
....
I tried to tighten the collar up enough to choke him. And that didn't work.... [I thought] I was going to die.... I got him to the edge of the building where I could stand him in the corner.... I was already covered with blood at that time. And I had a pair of high boots on and I could feel the blood squishing between my toes at that time.
....
So I got him stood up and I leaned against him. And at that time I tried to choke him again `cause I had a better hold and it didn't bother him.
So I get to the point where I just looked down and I could just see the jaws going up and down on my arm.... And I could just feel him crunching on my bone....
....
I drove my fingers in his eye sockets... [and] squeezed my fingers together in his head.... [H]is jaw had actually let go enough off my bone.... And then I ripped my arm out of his mouth and I still had a hold in his eye sockets. At that point I dragged him to the kennel and dragged him back inside.
Abbott then managed to get down to the loading dock, where he met a man who called for an ambulance.
Reynolds learned of the attack and immediately returned to New Jersey. Although he testified that he had only taken Diesel on a trial basis, reserving the unexpressed option of returning the dog to LCP, he never called the prison to arrange for the dog's return.
He reinforced the kennel by putting a top on it, by adding or replacing the latch, and by placing a chain and padlock on the gate. During the next three weeks, he kept the dog in the kennel, providing food and water, and cleaning away the dog's droppings.
On June 24, 1995, Reynolds, having decided to bring Diesel to the ASPCA, entered the warehouse and approached the dog's kennel. This is his description of the ensuing attack:
I opened the kennel door slightly, about an inch and a half, just enough to slide the kennel pole through the crack and gate. And ... he was well within reach of the kennel pole and I just reached in to put it around his neck. He wasn't growling or barking or, you know, or going crazy but he moved just enough to avoid the ... noose on the kennel pole and put his head down and he almost rammed the gate.... And he hit hard enough to ... push me backwards and force his way through the kennel.
As he did that, he ... slipped and went down. And when he came up, it was obvious that he had focused on me. And was in an aggressive approach. And he was ... coming up in my groin area. And started to attempt to bite me in the groin area. And so I used the kennel pole to deflect his attack.
I started to back up and I was trying to pull my gun. And he jumped and hit *421 me in the chest and knocked me over backwards.
....
[He] grabbed me in my biceps area and just basically swallowed my whole arm here. And he started to chew.... I yelled at him. I told him out. I told him ous. I gave him German commands. And it had absolutely no effect on him. He just continued to hold his grip.
I then started to talk to him. I tried, you know, soothe him a little bit so that, you know, I could maybe, you know, get him to calm down and so my tone changed and I was saying, "It's okay, Diesel. It's okay." And then I could feel that he was chewing on my arm.... And I felt my ... arteries or muscle snap.... I knew I was in trouble. And I started to bleed all over the place. Blood was squirting in my face. It was all over the floor.
And so I took my left hand and I shoved it into his eyes as far as I could.... [I]t didn't do any good at all so I took my fingers out of his eyes.
And I rolled over on top of him and I grabbed him by the throat and I choked him until he passed out.... I remember grabbing him by the nose and opening his mouth so that I could get my arm out of his teeth.
And I stood up and I was able to get my gun out. And I was trying to shoot him. I had my gun out and I was trying to squeeze the trigger....
But I didn't have enough strength in my right hand to pull the trigger. And so he woke up and he bit me in the left leg. And he had a hold of my left leg. And he was trying to sink his teeth into the top. He had already gotten his teeth to tear the skin on the side of my leg....
And so I looked over at my arm and I had torn skin and my muscles were hanging out and I was bleeding all over the place. And I knew that I wasn't going to be able to hold my gun still enough to shoot him so I switched hands. And I shot him ... in the top of the back with my left hand. And he let go and he bit me in the right ankle again.
And I shot him a second time and he let go of my right ankle. And he started to run. And so I shot him again a third time when he was about 10 or 15 feet away from me....
Reynolds then followed the dog, found him at the entry door, sitting, but still alive. When another shot, this time to the dog's head, did not cause death, Reynolds got a kennel pole, put the noose around the dog's neck, and dragged him back to the kennel. He secured the kennel, made his way outside, and entered his truck. As he was trying to place a 911 call, his wife arrived. She went next door and called for help. When the ambulance did not arrive promptly, she drove her husband to the hospital.

II

LCP'S LIABILITY
LCP was found liable for the tort of negligent misrepresentation involving risk of physical harm. It admitted at trial and concedes here that this tort is recognized as common law by Pennsylvania and New Jersey; however, on appeal it introduced the new contention that the tort was inapplicable because it owed plaintiffs no duty. In the alternative, it argues that even if it breached a common law duty, as a matter of choice-of-law or comity, we should apply the Pennsylvania Public Subdivision Tort Claims Act ("PSTCA"), 42 Pa. Cons.Stat. Ann. §§ 8541 and 8542, which it claims provides immunity. We reject these contentions, and we also reject LCP's further argument that the PSTCA's $500,000 limitation on compensatory damages should be given recognition as a matter of comity.
*422 A. THE TORT OF NEGLIGENT MISREPRESENTATION
LCP claims that plaintiffs' negligence action fails because they did not establish a special relationship giving rise to a duty of care. The tort of negligent misrepresentation involving risk of physical harm is defined in Restatement (Second) of Torts § 311 (1965):
(1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results
(a) to the other, or
(b) to such third persons as the actor should expect to be put in peril by the action taken.
(2) Such negligence may consist of failure to exercise reasonable care
(a) in ascertaining the accuracy of the information, or
(b) in the manner in which it is communicated.
"Pennsylvania has long recognized the common law tort of negligent [mis]representation," Gibbs v. Ernst, 538 Pa. 193, 647 A.2d 882, 891 (1994), and its intermediate appellate courts have specifically accepted section 311 as law. Rice v. Bell Tel. Co., 362 Pa.Super. 312, 524 A.2d 522, 524 (1987); English v. Lehigh County Auth., 286 Pa.Super. 312, 428 A.2d 1343, 1356-57 (1981).
Although New Jersey has not yet considered section 311, we have recognized the tort of negligent misrepresentation in other contexts, see, e.g., Carroll v. Cellco Partnership, 313 N.J.Super. 488, 502, 713 A.2d 509 (App.Div.1998), United Jersey Bank v. Kensey, 306 N.J.Super. 540, 553-54, 704 A.2d 38 (App.Div.1997), certif. denied, 153 N.J. 402, 709 A.2d 795 (1998), and Berry v. Playboy Enters., Inc., 195 N.J.Super. 520, 529-32, 480 A.2d 941 (App. Div.1984), certif. denied, 99 N.J. 231, 491 A.2d 720 (1985).
In deciding whether section 311 should be applied to the gift of a vicious dog, we are guided by the general principles described in Dunphy v. Gregor, 136 N.J. 99, 642 A.2d 372 (1994):
The imposition of a duty is the conclusion of a rather complex analysis that considers the relationship of the parties, the nature of the riskthat is, its foreseeability and severityand the impact the imposition of a duty would have on public policy. Ultimately, whether a duty exists is a matter of fairness.
[Id. at 108, 642 A.2d 372 (citations omitted).]
The Court also noted that it had recognized, in numerous settings, that traditional principles of tort liability can be adapted to address areas in which recognition of a cause of action and the imposition of a duty of care are both novel and controversial.
[Id. at 109, 642 A.2d 372 (citations omitted).]
Application of the traditional tort of negligent misrepresentation to the gift of a vicious dog is neither novel nor controversial. Apart from section 311's longstanding, though implicit, recognition of this cause of action, fairness and common sense dictate endorsement of the principle in this context. LCP knew of the dog's nature. The risk of attack was unquestionably foreseeable since the dog had already bitten its handlers on five occasions. Considering the dog's size, temperament, and training as an attack dog, there was a grave risk to plaintiffs of severe personal injury. Finally, imposition of the duties set forth in section 311 in this instance would enhance the public policy, recognized by our common law and dog-bite statute, of protecting the public from vicious dogs. See DeRobertis v. Randazzo, 94 N.J. 144, 150-55, 462 A.2d 1260 (1983).[2] *423 Therefore, we hold that section 311 expresses a common law doctrine applicable to any transfer of a vicious dog in this state. Under that section, the duty of care arises whenever the elements of the tort are proven.
B. LCP'S IMMUNITY CLAIMS
Relying on the principles of comity and choice-of-law, LCP demands full immunity under the PSTCA or, at least, a reduction of plaintiffs' damage claims to the limits of liability established by the PSTCA.
"Comity is not a binding obligation on the forum state, but a courtesy voluntarily extended to another state for reasons of `practice, convenience and expediency.'" City of Philadelphia v. Austin, 86 N.J. 55, 64, 429 A.2d 568 (1981) (citation omitted). That courtesy must not be extended to the foreign state when the result "would contravene the public or judicial policy of the forum state." Ibid.
Choice-of-law is determined by application of a "flexible `governmental-interest' standard, which requires application of the law of the state with the greatest interest in resolving the particular issue that is raised in the underlying litigation." Gantes v. Kason Corp., 145 N.J. 478, 484, 679 A.2d 106 (1996) (citations omitted). Under this standard, the first question to be answered is whether there is an "actual conflict between the laws of the respective states, a determination that is made on an issue-by-issue basis." Ibid. If a conflict exists, we are obliged to "`identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties.'" Id. at 485, 679 A. 2d 106 (citation omitted).
LCP's claim of full immunity is based on the PSTCA. That statute begins with the proposition that no liability may be imposed on a local public agency unless the act so permits. 42 Pa. Cons.Stat. Ann. § 8541. The next section, 8542(a), provides that a local agency may be held liable if (1) the "damages would be recoverable under common law or a statute" in an action against a nongovernmental person or entity; or (2) "[t]he injury was caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties with respect to one of the categories listed in subsection (b)." One of the categories of activity listed in section 8542(b) is
(8) Care, custody or control of animals.The care, custody or control of animals in the possession or control of a local agency, including but not limited to police dogs and horses. Damages shall not be recoverable under this paragraph on account of any injury caused by wild animals, including but not limited to bears and deer, except as otherwise provided by statute.
LCP argues that since it was not in "possession or control" of Diesel at the time of the attacks, it is immune from liability under the PSTCA. This argument overlooks the nature of the tort of negligent misrepresentation involving risk of physical harm. Under this tort, LCP's conduct must be evaluated in relation to the time when the negligent misrepresentations were made. Cf. Kelly v. Gwinnell, 96 N.J. 538, 548, 476 A.2d 1219 (1984) ("[A] host who serves liquor to an adult social guest, knowing both that the guest is intoxicated and will thereafter be operating a motor vehicle, is liable for injuries inflicted on a third party as a result...."). At that time, LCP was in possession of the dog.
*424 LCP has provided no Pennsylvania authority suggesting immunity in these circumstances. On the other hand, a plain reading of the statute establishes LCP's exposure to liability. In short, transfer of an animal is an act relating to the custody or control of that animal. If misrepresentations have been made in that regard by public employees, acting within the scope of their employment, and those misrepresentations reasonably induce another to accept the transfer, there is no immunity when the misrepresentations are a proximate cause of injury caused by the animal. Thus, neither comity nor choice-of-law is implicated on this issue.[3]
LCP's alternative argument is that it should at least receive the benefit of the PSTCA's $500,000 limitation on damages. 42 Pa. Cons.Stat. Ann. § 8553. On this issue, the policies of the respective states conflict. A plaintiff's compensatory damages against public entities are unlimited under the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 12-3.
In Nevada v. Hall, 440 U.S. 410, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979), an automobile accident case arising in California, in which the state of Nevada was a defendant, the Court established the principle that under the federal constitution a state is not entitled to immunity from suit in the courts of another state. 440 U.S. at 414, 426-27, 99 S.Ct. at 1185, 1191, 59 L.Ed.2d at 421, 428-29. It also held that the forum state was not obliged to accept a limitation on monetary damages created by the legislature of the foreign state.
In this Nation each sovereign governs only with the consent of the governed. The people of Nevada have consented to a system in which their State is subject only to limited liability in tort. But the people of California, who have no voice in Nevada's decision, have adopted a different system. Each of these decisions is equally entitled to our respect.
[Id. at 426, 99 S.Ct. at 1191, 59 L.Ed.2d at 428-29.]
Concerned about the implications of its decision on our federal system, the Court added this advice:
It may be wise policy, as a matter of harmonious interstate relations, for States to accord each other immunity or to respect any established limits on liability. They are free to do so. But if a federal court were to hold, by inference from the structure of our Constitution and nothing else, that California is not free in this case to enforce its policy of full compensation, that holding would constitute the real intrusion on the sovereignty of the Statesand the power of the peoplein our Union.
[Id. at 426-27, 99 S.Ct. at 119l, 59 L.Ed.2d at 429.]
Acceptance of the $500,000 limitation in the circumstances of this case would substantially reduce the recovery by each plaintiff. Under section 8553(b), multiple claimants injured in the same transaction or series of transactions must share the $500,000. City of Philadelphia v. Nationwide Ins. Co., 92 Pa.Cmwlth. 20, 498 A.2d 462, 467-68 (1985).
Requiring a person injured by the negligence of a public entity to accept less than full compensation is contrary to the legislative policy of this state. The subject was addressed in Chapter 2 of the Report of the Attorney General's Task Force on Sovereign Immunity (1972), which "`accompanied the [Tort Claims] Act during its consideration by the Legislature [and] ha[s] the precedential weight and value of legislative history.'" Thorpe v. Cohen, 258 N.J.Super. 523, 528-29, 610 A.2d 878 (App. *425 Div.1992) (citation omitted). The Report states:
There should be no monetary limits upon recovery against a public entity.
There are several jurisdictions which provide monetary limits of recovery; in effect they establish a ceiling above which no claimant may recover. This approach has been rejected because it is believed that the establishment of monetary limits is an arbitrary and unjust way to limit recovery against a public entity. By precluding various types of damage recovery and by foreclosing double recovery through collateral sources, it is suggested that sufficient protection for the public treasury is being provided on a rational and reasonable basis. In fact, it has been estimated by an official in California that at least 50 per cent of the total damage awards in that State are for pain and sufferingan estimate which clearly supports the approach contained in this report. If there is concern with the potential large one-shot judgment, then it is suggested that an appropriate insurance policy providing for catastrophe coverage be obtained.
[Report of the Attorney General's Task Force on Sovereign Immunity (1972) in Margolis and Novack, Claims Against Public Entities R-9 (1999) (emphasis added).]
Given this legislative history, and mindful that under New Jersey's choice-of-law principles "the State whose substantive law controls also governs the question of damages," Marinelli v. K-Mart Corp., 318 N.J.Super. 554, 567-68, 724 A.2d 806 (App. Div.) certif. granted, 161 N.J. 331, 736 A.2d 524 (1999), we reject LCP's claim to the $500,000 limitation contained in the Pennsylvania statute.
In McDonnell v. Illinois, 319 N.J.Super. 324, 725 A.2d 126 (App.Div.), certif. granted, 161 N.J. 334, 736 A.2d 527 (1999), we held that Illinois, which had established an office in New Jersey, was subject to the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -42, for discriminatory acts committed here. In doing so, we rejected Illinois' claim to sovereign immunity. We have no lesser interest in the enforcement of our common law. If the right to full compensation for tortious conduct is to be limited in cases against the public entities of other states, that policy determination should be made by our Legislature.
C. THE ADMISSION OF THE OPINION EVIDENCE
LCP argues that the trial court erred in permitting into evidence those portions of the Unusual Activity Reports which contained opinions of its officers. The specific references were to comments that the dog was a "liability" or had "irreversible medical problems."
These opinions were not admissible to prove the truth of the matters asserted. Liptak v. Rite Aid, Inc., 289 N.J.Super. 199, 221-22, 673 A.2d 309 (App. Div.1996). But they were relevant to the fraud count. Judson v. Peoples Bank & Trust Co., 25 N.J. 17, 26, 134 A.2d 761 (1957) (indicating that expressions of opinion given by one who has secured the confidence of the victim or holds himself out as having special knowledge of the matter may support a claim of fraud). Here, the officers indicated that the dog was friendly towards people, withholding the contrary views expressed in their reports. The opinions were also relevant to the negligent misrepresentation claim, since having those views was inconsistent with the decision to give the dog away instead of killing him, and with the nature of the officers' communications to plaintiffs.
When evidence is admissible for one purpose but is not admissible for another purpose, "the judge, upon request, shall restrict the evidence to its proper scope and shall instruct the jury accordingly...." N.J.R.E. 105 (emphasis added). Although the judge had indicated that he *426 would give a limiting instruction, he did not. However, no limiting instruction was submitted by LCP and no objection was taken to the failure of the judge to give a limiting instruction.
The failure to give a limiting charge may be recognized as plain error only if it had the clear capacity of producing an unjust result. R. 2:10-2. Officer Geib explained to the jury that he had no basis for his comment that the dog had "irreversible medical problems." And, indeed, it was quite apparent that Geib was not expressing a medical opinion and that, as he said, the comment simply reflected his anger at having been bitten again. Himmelsbach was permitted to explain that he had used the word "liability" only to mean that the dog was of no use to the prison and could no longer be housed in the kennels. But of overarching importance is the simple fact that the evidence of Diesel's viciousness was overwhelmingly established by the uncontested evidence that he had bitten his handlers on five separate occasions, two of which were only days before the transfer took place. In these circumstances, we cannot say that the introduction of the opinions without a limiting instruction had the clear capacity to produce an unjust result.

III

THE LIABILITY OF GUARD DOGS
The jury found Guard Dogs liable to Abbott under the dog-bite statute, N.J.S.A. 4:19-16,[4] and under the common law for negligence. Guard Dogs contends that it was entitled to a directed verdict and judgment n.o.v. because of Abbott's stipulated status as an independent contractor. We are called upon to determine the duty of a dog owner to an independent contractor who is bitten while carrying out his contractual obligation to care for the dog on the owner's property.
Generally, a landowner must use reasonable care to protect independent contractors against "known or reasonably discoverable dangers." Kane v. Hartz Mountain Indus., 278 N.J.Super. 129, 140, 650 A.2d 808 (App.Div.1994), aff'd, 143 N.J. 141, 669 A.2d 816 (1996); Accardi v. Enviro-Pak Sys. Co., 317 N.J.Super. 457, 462, 722 A.2d 578 (App.Div.) certif. denied, 158 N.J. 685, 731 A.2d 45 (1999). But that duty does not extend to protecting the independent contractor "from the very hazard created by doing the contract work." Sanna v. National Sponge Co., 209 N.J.Super. 60, 67, 506 A.2d 1258 ( App.Div.1986). The landowner is not obliged to eliminate "operational hazards which are obvious and visible to the invitee upon ordinary observation and which are part of or incidental to the very work the contractor was hired to perform." Ibid.
Guard Dog argues that since Abbott had been hired as an independent contractor to care for and train the dog, and since any dog may bite, there should be no liability because the hazard of being bitten was an obvious operational risk of the contract. The problem with that syllogism is that it is based on a mistaken concept of the hazard presented by this dog. This case does not involve the ordinary risk that a dog may bite; it involves the hazard presented by a vicious dog whose nature has not been disclosed. In that context, the analysis becomes more complicated.
*427 In Emmons v. Stevane, 77 N.J.L. 570, 73 A. 544 (E. & A.1908), the Court considered the liability of a dog owner to an independent contractor who had agreed to board the dog and was bitten without warning when she placed her hand on the dog's head. The owner had told plaintiff the dog was gentle even though he knew the dog was vicious. The Court held plaintiff was entitled to recover damages from the owner because "the owner of an animal having vicious habits ... is bound to disclose them (if known to him) to a bailee. Such is the case when a person leaves his horse with a blacksmith to be shod." Id. at 573, 73 A. 544. The Court, however, also indicated an exception to that rule: proof that the "bailee was chargeable with knowledge of [the animal's] true disposition" would relieve the owner of liability. Id. at 574, 73 A. 544.
Emmons, decided under the common law doctrine of absolute liability, is not directly implicated here because there is no evidence that Guard Dogs knew or "had reason to know of the dog's abnormally dangerous characteristics." DeRobertis, supra, 94 N.J. at 153, 462 A.2d 1260. Guard Dogs, like Abbott, was misled by LCP. However, the case is significant because it rejects the notion that an independent contractor who agrees to care for a domestic animal assumes the risk of being attacked when the animal's vicious nature has been concealed.
Since common law absolute liability is not involved here, we turn to plaintiff's cause of action under the dog-bite statute and the contention that primary assumption of the risk bars recovery. To establish liability under the statute, a plaintiff must prove that defendant was the dog owner, that he was bitten, and that the bite occurred while he was in a public place, or lawfully in a private place, including the property of the owner. Id. at 151, 462 A.2d 1260. The only defense previously recognized is that plaintiff unreasonably and voluntarily exposed himself to a known risk. Pingaro v. Rossi, 322 N.J.Super. 494, 505, 731 A.2d 523 (App.Div.1999).
Guard Dogs recognizes the inapplicability of that defense, since Abbott was bitten while he was picking up tools a substantial distance from the kennel and was completely unaware of the grave risk presented by the dog's presence in the warehouse, but it contends that Abbott's independent contractor status bars recovery since he knew that any dog might bite.
The reliance of Guard Dogs on Abbott's status has some merit. In ordinary circumstances, when a dog is delivered for care to an independent contractor the owner is entitled to rely on the doctrine of primary assumption of the risk. Cf. Del Tufo v. Township of Old Bridge, 147 N.J. 90, 112, 685 A.2d 1267 (1996). Thus, for example, in Nelson v. Hall, 165 Cal.App.3d 709, 211 Cal.Rptr. 668 (1985), the court held under its dog-bite statute that "a dog owner who does no more than turn his or her dog over to a qualified veterinarian for medical treatment should not be held strictly liable when the dog bites [the] veterinarian...." Id. at 673. The court explained that liability would not be imposed because the veterinarian is "aware of the risk that any dog, regardless of its previous nature, might bite while being treated, ... determines the method of treatment and handling of the dog ... and is in the best position to take necessary precautions...." Ibid. But the court also said
[I]f a dog owner purposefully or negligently conceals a particular known hazard from a veterinarian, he or she would not be relieved of liability, for this would expose the injured person to an unknown risk.
[Id. at 673 n. 4.]
The analysis of the Nelson court is sound. And since a veterinarian has all the characteristics of an independent contractor, Nelson should apply to other independent contractors, such as Abbott, who agree to care for a dog. But under Nelson, *428 Abbott's recovery would be barred because of the lack of evidence that the unusual hazard presented by Diesel was known to Guard Dogs. When a dog owner turns his dog over to an independent contractor who has agreed to care for the dog, the owner is not liable under the dog-bite statute when the dog bites the independent contractor unless the owner knew, or had reason to know, the dog was vicious and withheld that information. Similarly, under the doctrine of primary assumption of the risk, as described in Emmons, supra, it would appear that an owner would not be liable under the statute to an independent contractor who undertakes the care of a domestic animal with knowledge that it is particularly dangerous.
Guard Dogs, however, cannot avoid liability because the judgment was also based on common law negligence. Without objection, the judge charged that Abbott could prevail on proof that Guard Dogs was negligent in failing to ascertain the dog's propensity for violence and in providing an appropriate warning to Abbott. Although unstated during trial, the premise for the charge was that Guard Dogs had a duty to its independent contractor to make a reasonable investigation of the dog's history before turning the dog over to him.
Ultimately, whether a duty exists is a matter of fairness, depending on a consideration of the "relationship of the parties, the nature of the riskthat is, its foreseeability and severityand the impact the imposition of a duty would have on public policy." Dunphy v. Gregor, supra, 136 N.J. at 108, 642 A.2d 372.
Those considerations support the imposition of the duty of reasonable inquiry in the peculiar circumstances of this case. Although Abbott was an independent contractor, Guard Dogs held the dominant position and made the decision to accept the dog. Abbott reasonably relied on his employer's judgment respecting the amenability of the dog for guard work. Since Guard Dogs knew the dog was trained to attack humans, had bitten his trainer on one occasion, and was so aggressive toward other dogs that the prison had determined him to be undesirable after some fourteen months of training and use, the imposition of the duty imposed by the trial court appears reasonable. It gives force in this context to the landowner's duty to protect an independent contractor against dangers reasonably discoverable by the landowner. And it is particularly appropriate since the special hazards presented by this dog were neither "obvious [nor] visible." Sanna, supra, 209 N.J.Super. at 67, 506 A.2d 1258.
Guard Dogs takes issue with the judge's charge on Abbott's contributory negligence and his failure to charge assumption of the risk. These issues need not be addressed because there was no evidence to support either defense. Although Abbott assumed the risk that any dog might bite, he did not assume the risk of working with a vicious dog, and his mere presence at the warehouse to pick up his tools did not warrant a charge on contributory negligence. Therefore, the alleged errors could not have prejudiced the defense.
Guard Dogs also argues that it was entitled to judgment n.o.v. or a new trial because the liability verdict was against the weight of the evidence. More particularly, it claims it was not negligent because its principal, Mr. Reynolds, asked for the dog's history and was misled. The jury rejected the contention that Reynolds was justified in relying on the information he received from Geib, a prison guard and the dog's trainer. Given the dog's history, as related by Geib, a reasonable jury could well have concluded that further inquiry was requiredthat, for example, the accuracy of Geib's information should have been confirmed with superior authorities within the prison. Therefore, the judge correctly denied both motions. See Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969); R. 4:49-1(a).

*429 IV

THE EXCESSIVE DAMAGES CLAIMS
Both defendants unsuccessfully moved for a new trial on damages on the ground that the damage verdicts were excessive. The trial court's ruling cannot be reversed on appeal "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1; Caldwell v. Haynes, 136 N.J. 422, 432, 643 A.2d 564 (1994). As in the trial court, we "must consider the evidence in the light most favorable to the prevailing part[ies]." Ibid. With those principles in mind, we turn first to Abbott's damage award.
The dog did not simply bite Abbott's arm and let go; it chewed on his arm, biting down with increasing force, causing Abbott to be covered with blood and to believe that he might die.
The bite damaged about 30% of Abbott's left arm muscles, and 15% of those muscles had to be removed. Abbott spent fourteen days in the hospital and was subjected to four operations. At times, his treatment caused excruciating pain. He has extensive scars, permanent weakness in his left arm and hand, permanent diminished sensation in several fingers, and nerve and muscle damage. His arm "really throbs and hurts in the cold weather" or "after an hour's work." He is self-conscious about his deformity. The experience caused post-traumatic stress disorder, as indicated by his recurring nightmares, depression, alcohol dependency, and a sixty-pound weight gain.
Glen Curt Reynolds suffered a sustained and savage attack that resulted in numerous injuries. He spent six days in the hospital and was subjected to three surgeries, which included treatment of severed arteries and reattachment of part of his triceps muscle. He has two scars on his right arm, one that is three and a half inches long, and another that is two inches long. He has a scar that runs from his armpit to his elbow, and a four-inch scar on his left leg. He also has a puncture scar under his right arm and two puncture scars on his right ankle. He lost muscle tissue, and he suffers from some loss of function and decreased sensation in the right arm. From time to time, he continues to experience pain in his elbow, shoulder, and arm. He has difficulty sleeping, experiences nightmares, feels irritable, becomes highly emotional, and is fearful of dogs, all aspects of post-traumatic stress disorder.
Dionna Reynolds testified that the attack on her husband had dramatically affected their relationship. He has become irritable, insensitive to her feelings and needs, and less helpful with household chores. In accordance with a recommendation from her husband's psychologist, they no longer sleep in the same bed.
A jury's assessment of damages may not be set aside unless clearly against the weight of the evidence. Ibid. Moreover, the verdict must stand unless it shocks the judicial conscience. Ibid. Although the award to Dionna Reynolds may have been generous, it is not so high as to shock the conscience. The severe physical and emotional injuries suffered by Glen Curt Reynolds and Martin Abbott provided adequate support for their damage awards.

V

ABBOTT'S CROSS-APPEAL
Abbott's first point is that the trial court erred in refusing to enter judgment against Guard Dogs for the full amount of his damages despite the jury's determination that Guard Dog's share of the fault was only 15%. He claims entitlement to that result under the dog-bite statute, which he argues overrides the Comparative Negligence Act, N.J.S.A. 2A:15-5.2. This point is clearly without merit. R. 2:11-3(e)(1)(E). Moreover, as we have explained above, Guard Dogs was not liable to Abbott under the dog-bite statute; its *430 liability was based on common law negligence.
Abbott's second point is that he was entitled to recover from Guard Dogs his attorney's fees, expenses, and interest under the offer-of-judgment rule, R. 4:58. Before trial, Abbott had offered to settle with Guard Dogs for $500,000. The offer was refused and Abbott obtained a verdict against Guard Dogs for $225,000. The rule provides, in pertinent part, "In an action for negligence or unliquidated damages, however, no attorney's fee shall be allowed to the offeror unless the amount of the recovery is in excess of 120% of the offer." R. 4:58-2. Since Abbott recovered less than he had demanded, the rule provides no relief.
Affirmed.
NOTES
[1] Plaintiffs dismissed their negligence claims against the individual defendants employed by LCP. Their fraud claims against those individuals were rejected by the jury. Abbott dismissed his claim against Reynolds. Thus, the only parties with whom we are concerned are LCP, Guard Dogs, and the three plaintiffs.
[2] We note that LCP was not entitled to argue a lack of duty on appeal since the issue was never raised below. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973). Furthermore, LCP conceded in the trial court that plaintiffs had presented adequate proofs to support consideration of this claim by the jury. It cannot disavow that concession and argue to the contrary on appeal. Brett v. Great Am. Recreation, Inc., 144 N.J. 479, 503, 677 A.2d 705 (1996); First Am. Title Ins. Co. v. Vision Mortgage Corp., 298 N.J.Super. 138, 143, 689 A.2d 154 (App.Div. 1997). Finally, the judge's charge was substantially in accord with the principles of section 311 and LCP expressed no objection.
[3] If we understood the Pennsylvania statute to provide immunity, we would reject its application here because our governmental policies of deterring tortious behavior within our borders and providing full protection to citizens negligently injured far outweigh Pennsylvania's interest in protecting its public purse. Cf. Gantes v. Kason Corp., 145 N.J. 478, 679 A.2d 106 (1996).
[4] This statute provides:

The owner of any dog which shall bite a person while such person is on or in a public place, or lawfully on or in a private place, including the property of the owner of the dog, shall be liable for such damages as may be suffered by the person bitten, regardless of the former viciousness of such dog or the owner's knowledge of such viciousness.
For the purpose of this section, a person is lawfully upon the private property of such owner when he is on the property in the performance of any duty imposed upon him by the laws of this state or the laws or postal regulations of the United States, or when he is on such property upon the invitation, express or implied, of the owner thereof.