# STATE OF MICHIGAN

# COURT OF APPEALS

BANK OF AMERICA, NA,

      Plaintiff-Appellant,

v

FIDELITY NATIONAL TITLE INSURANCE
COMPANY,

      Defendant-Appellee,

and

FIDELITY TITLE COMPANY, HARRY S.
ELLMAN, JEANENNE FOSTER KEELY,
formerly known as JEANENNE FOSTER,
FREEDOM FINANCIAL MORTGAGE
LENDING, LLC, JOHN HUSAR, FIRST
MORTGAGE CORPORATION, THOMAS R.
GRACZYK, and RONALD KELLER,

      Defendants.

UNPUBLISHED
June 21, 2016

Nos. 311798, 312426, 313797
Oakland Circuit Court
LC No. 10-114319-CK

BANK OF AMERICA, NA,

      Plaintiff/Counter-Defendant-
      Appellant,

v

FIDELITY NATIONAL TITLE INSURANCE
COMPANY, formerly known as LAWYERS
TITLE INSURANCE CORPORATION,

      Defendant/Counter-Plaintiff-
      Appellee,

and

No. 316538
Genesee Circuit Court
LC No. 11-095286-CZ

-1-

CHICAGO TITLE INSURANCE COMPANY,
formerly known as TICOR TITLE INSURANCE
OF FLORIDA,

                    Defendant/Counter-Plaintiff,

and

GREAT LAKES BROKER FUNDING, KURT W.
HEINTZ, MICHIGAN LAND DEVELOPMENT,
THOMAS KELLER, TITLE MICHIGAN
AGENCY, JEANENNE FOSTER KEELY,
STATE VALUE APPRAISALS, NATHAN B.
HOGAN, DOUGLAS K. SMITH, MORTGAGE
HOTLINE, INC., doing business as AMERICAN
MORTGAGE DECISIONS, JAMES D. LAMAR,
III, and JAMES J. FISH,

                    Defendants.

Before:  METER, P.J., and SHAPIRO and O'BRIEN, JJ.

PER CURIAM.

In Docket No. 311798, plaintiff, Bank of America, NA (BOA), appeals as of right a final order granting BOA's motion to dismiss its remaining claims following an earlier order granting summary disposition in favor of defendant, Fidelity National Title Insurance Company (FNTIC), with respect to BOA's breach of contract claims against FNTIC.  In Docket No. 312426, BOA appeals as of right an order granting FNTIC's motion for costs and awarding FNTIC costs in the amount of $19,580.04.  In Docket No. 313797, BOA appeals as of right an order granting FNTIC's motion for attorney fees in the amount of $164,539.00.  In Docket No. 316538[1], plaintiff, BOA, appeals as of right a final order dismissing BOA's claims against defendant Chicago Title Insurance Company (CTIC), formerly known as Ticor Title Insurance of Florida, and dismissing CTIC's counterclaims against BOA following an earlier order granting summary disposition in favor of defendant FNTIC, formerly known as Lawyers Title Insurance Corporation (LTIC), with respect to BOA's breach of contract claims against FNTIC.  The appeals were consolidated to advance the efficient administration of the appellate process. *Bank of America, NA v Fidelity Nat'l Title Ins Co*, unpublished order of the Court of Appeals, entered August 6, 2015 (Docket Nos. 311798, 312426, 313797, 316538).

---

[1] As reflected in the caption, the appeal in Docket No. 316538 arises from a different lower court file than the appeals in Docket Nos. 311798, 312426, and 313797 arise.

In Docket No. 311798, we reverse the order granting summary disposition to FNTIC regarding BOA's breach of contract claims, reverse the order denying BOA's motion for summary disposition concerning FNTIC's counterclaims and affirmative defenses, and remand for further proceedings consistent with this opinion. In Docket Nos. 312426 and 313797, we vacate the order striking the case evaluation award and the orders awarding costs and attorney fees to FNTIC. In Docket No. 316538, we reverse the order granting summary disposition to FNTIC regarding BOA's breach of contract claims, affirm the order denying BOA's motion for summary disposition concerning its breach of contract claims, affirm the order granting summary disposition to BOA regarding FNTIC's counterclaims and affirmative defenses, and remand for further proceedings consistent with this opinion.

These cases arise from allegations of mortgage fraud perpetrated by various individuals and entities against BOA, the mortgage lender that commenced both of the lower court actions that led to the present appeals. Pertinent to these appeals, BOA filed breach of contract claims against FNTIC, the title insurer that had issued closing protection letters (CPLs) that promised to indemnify BOA for any actual losses arising from fraud or dishonesty in handling BOA's funds or documents on the part of the closing agent that was also the title agent of FNTIC, in each action. In each underlying action, the trial court granted summary disposition to FNTIC on BOA's breach of contract claims, and BOA challenges those respective determinations on appeal in Docket Nos. 311798 and 316538. In Docket Nos. 312426 and 313797, BOA challenges the trial court's order striking the case evaluation award and the trial court's award of costs and attorney fees to FNTIC in the same underlying action that led to the appeal in Docket No. 311798.

## I. STANDARDS OF REVIEW

"This Court reviews de novo a trial court's decision on a motion for summary disposition." *Hackel v Macomb Co Comm*, 298 Mich App 311, 315; 826 NW2d 753 (2012).

A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint on the basis of the pleadings alone to determine if the opposing party has stated a claim for which relief can be granted. A reviewing court must accept all well-pleaded allegations as true and construe them in the light most favorable to the nonmoving party. The motion should be granted only if no factual development could possibly justify a recovery.

A motion brought under MCR 2.116(C)(9) seeks a determination whether the opposing party has failed to state a valid defense to the claim asserted against it. A motion under MCR 2.116(C)(9) is analogous to one brought pursuant to MCR 2.116(C)(8) in that both motions are tested by the pleadings alone, with the court accepting all well-pleaded allegations as true. When a party's defenses are so untenable as a matter of law that no factual development could possibly deny the plaintiff's right to recover, the motion is properly granted. [*Id*. at 315-316 (citations and internal quotation marks omitted).]

"In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most

favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). "Summary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

The interpretation of a contract presents a question of law that is reviewed de novo. *Kloian v Domino's Pizza, LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006).

> In interpreting a contract, this Court's obligation is to determine the intent of the parties. This Court must examine the language of the contract and accord the words their ordinary and plain meanings, if such meanings are apparent. If the contractual language is unambiguous, courts must interpret and enforce the contract as written. Thus, an unambiguous contractual provision is reflective of the parties' intent as a matter of law. [*In re Egbert R Smith Trust*, 274 Mich App 283, 285; 731 NW2d 810 (2007), aff'd 480 Mich 19 (2008) (citations and internal quotation marks omitted).]

## II. FNTIC'S LIABILITY UNDER THE CPLS

To prevail on a breach of contract claim, a party "must establish by a preponderance of the evidence that (1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach." *Bank of America, NA v First American Title Ins Co* 499 Mich 74, ___; ___ NW2d ___ (2016) (Docket No. 149599); slip op at 23 (*FATCO*).

> A CPL is a contract between the title company and the lender whereby the title insurance company agrees to indemnify the lender for any losses caused by the failure of the title agent to follow the lender's closing instructions. A CPL is necessary because, while a title agent is the agent of the title insurance company for purposes of selling the title insurance policy (and binding the company to the insurance contract), that agency relationship does not extend to the title agent's conduct at the closing. As a result, a lender who also wants the title insurer to be responsible for the agent's acts in connection with escrow closing activities and services must separately contract with the title insurer for such additional protection by entering into an insured closing letter or closing protection letter. [*Id.* at ___; slip op at 27 (citations and internal quotation marks omitted).]

See also *New Freedom Mtg Corp v Globe Mtg Corp*, 281 Mich App 63, 80; 761 NW2d 832 (2008), overruled in part on other grounds by *FATCO*, 499 Mich 74 (2016) (" 'A closing protection letter is typically issued by a title insurance underwriter 't[o] verify the agent's authority to issue the underwriter's policies and to make the financial resources of the national title insurance underwriter available to indemnify lenders and purchasers for the local agent's errors or dishonesty with escrow or closing funds.' ") (citations and internal quotation marks omitted).

The CPLs issued for the closings at issue in Docket No. 311798 provided, in relevant part, that FNTIC would reimburse BOA "for actual loss incurred by [BOA] in connection with such closings . . . when such loss arises out of: . . . (2) Fraud or dishonesty of [the closing agent, Fidelity Title Company (FTC)] in handling [BOA's] funds or documents in connection with such closings." This contractual language plainly makes FNTIC liable if BOA suffered actual losses arising out of FTC's fraud or dishonesty in handing BOA's funds or documents in connection with the closings.

> The common meaning of "dishonesty" is the opposite of "honesty;" it is "a disposition to lie, cheat, or steal" or a "dishonest act; fraud." . . . [T]he plain meaning of "fraud" includes both actual fraud – an intentional perversion of the truth – and constructive fraud – an act of deception or a misrepresentation without an evil intent. Fraud may also be committed by suppressing facts – silent fraud – where circumstances establish a legal duty to make full disclosure. Such a duty of full disclosure may arise when a party has expressed to another some particularized concern or made a direct inquiry. [*FATCO*, 499 Mich at ___; slip op at 29-30 (citations and internal quotation marks omitted).]

A lender is not required to present evidence of concealed disbursements, shortages, or unpaid prior lien holders in order to recover for a closing agent's fraud or dishonesty if no such restrictions are contained in the CPL. *Id*. at ___; slip op at 30.

In the case appealed in Docket No. 311798, there is evidence establishing a genuine issue of material fact concerning whether BOA suffered actual loss arising out of the fraud or dishonesty of FTC in handling BOA's funds or documents in connection with the closings. There is evidence that FTC or its agents were aware of misrepresentations in documents submitted to BOA and that BOA's funds were dishonestly or fraudulently distributed. The evidence indicates that the loans at issue were sham transactions that used straw borrowers and artificially inflated property values to induce BOA to lend significant sums of money, as well as that FTC or its agents were aware of the misrepresentations and the fraudulent nature of the transactions at the time of closing.

In particular, with respect to BOA's loan to Jacqueline Buie (the Buie loan or transaction), Buie agreed to purchase 5228 Deer Run Circle, Orchard Lake, Michigan, from Robert Harden for $3.4 million. But, Harden purchased that property from Mike Awdish and Raidah Awdish for a significantly smaller sum, $2.1 million, on August 16, 2005, a mere 10 days before the Buie closing. The warranty deeds for both of these closings were notarized by Jeanenne Foster Keely (Foster), who was FTC's employee, and they were received for recording at the register of deeds on the same date. Under FNTIC's own guidelines, those facts suggest that the Buie transaction was a so-called "property flip" transaction, i.e., "a conveyance of real estate from A to B followed very shortly thereafter, or almost simultaneously, with another conveyance at a much higher sale price from B to a third party, C." The $1.3 million increase in the sales price over 10 days and the lack of evidence of financing for the earlier transfer indicated that FNTIC's approval was required for the Buie transaction. Also, FTC prepared title commitments for the Buie loan that listed Harden as the owner of 5228 Deer Run Circle *before* August 16, 2005, i.e., when he did not yet own the property. A request to show an intermediary

party such as Harden as the title owner is designated by FNTIC as a "red flag" to alert the closing agent to a possible flip transaction.

Further, the United States Department of Housing and Urban Development Settlement Statement (HUD-1 settlement statement) prepared by FTC and signed by Foster stated that Buie made a down payment of $651,348.95 at closing. As purported documentation of Buie's down payment, the FTC closing file contained a copy of a purported Charter One cashier's check for $735,000.00 made out to FTC. A subpoena of Charter One records established that this check was a counterfeit alteration of a check made out to State Farm in the amount of $137.33. According to FTC's ledger and check copies, Harden provided the $651,348.95 down payment listed on the HUD-1 settlement statement as having come from Buie. As part of the Buie closing, FTC issued three checks to Harden in the respective amounts of $651,348.95, $517,584.01, and $2,115,667.04, and Harden then endorsed the check for $651,348.95 back to FTC with the phrase "Buyer Funds" written on the front of the check. The $2,115,667.04 check was endorsed back to FTC with the phrase "Funds to Purchase" written on the front of the check. FTC's owner, Harry Ellman, testified that Harden used the funds from BOA to pay off the prior sellers, the Awdishes.

In short, these facts support inferences that the HUD-1 settlement statement prepared by FTC was falsified with knowledge that the supposed down payment check drawn on Charter One was counterfeit, and that Harden purchased the property in a so-called "double escrow" transaction whereby Harden purchased the property from the Awdishes with the funds supplied by BOA to finance Buie's purchase from Harden. FNTIC's own guidelines indicate that such transactions, in which the first transaction is funded by proceeds from the second transaction, are improper unless the first buyer comes to the first transaction with the funds necessary to close that transaction before the second transaction commences. Ellman admitted that this requirement was not complied with in the Buie transaction.

FTC's ledger also showed a $10,000.00 disbursement to Sanford M. Hoskow as a consulting fee in the Buie transaction even though Hoskow was not identified on the HUD-1 settlement statement. Ellman admitted that he was aware that Hoskow had been disbarred as an attorney and that he had been warned by Oakland Circuit Court Judge Norman Lippitt in late 2004 or early 2005 that Hoskow had a "nefarious background[]" and to be "leery or careful" with respect to Hoskow. Ellman also knew that Hoskow was a convicted felon who had served jail time "for something having to do with checks." Ellman nevertheless continued to do business with Hoskow after learning of his background, including 97 transactions in which Hoskow received disbursements, some of which were flip transactions.

With regard to BOA's loan to Jon Holmes (the Holmes loan or transaction), Holmes agreed to buy 2785 Cranbrook Ridge Court, Rochester, Michigan, for $5.4 million. BOA agreed to provide a $3,780,000.00 loan for the transaction. The HUD-1 settlement statement signed by Foster indicated that Holmes made a $1,787,824.91 down payment at closing. FTC's closing file contained a copy of a purported cashier's check for $1.8 million made out to FTC as apparent documentation of Holmes's down payment. A subpoena of the bank from which the check was to be drawn indicated that the check was a counterfeit alteration of a $10.00 check. In fact, the receipts and disbursements ledger for the Holmes transaction indicated that the funds for Holmes's purported down payment actually came from one of FTC's own accounts. In addition,

-6-

FTC's ledger showed a $10,000.00 disbursement to Hoskow, and Hoskow was not identified on the HUD-1 settlement statement. Ellman admitted that FTC failed to list other payees on the HUD-1 settlement statement, and this practice was frowned upon by 2005 because mortgage fraud was becoming more prevalent.

Ellman testified that it was FTC's practice to deposit a borrower's down payment check into an escrow account and to confirm that the check cleared, and he admitted that this was not done in this case, which was improper. Ellman also acknowledged that all of the funds disbursed in this case were BOA's funds given that no down payments were actually made. Ellman conceded that some employee of FTC must have known that the checks were counterfeit given that the checks were never actually deposited.

The evidence described above supports a conclusion that FTC fraudulently or dishonestly handled BOA's funds or documents. In the Buie transaction, FTC participated in arranging a flip transaction of the property with BOA's funds used to finance the second sale based on an inflated value of the property for that transaction, and FTC prepared the warranty deeds for both sales in this flip transaction. FTC also prepared title commitments that listed Harden as the owner before he owned the property, and FTC prepared a HUD-1 settlement statement inaccurately showing a down payment made by Buie. FTC did not attempt to deposit a counterfeit check submitted as a purported down payment for Buie, which was contrary to FTC's normal practice, suggesting knowledge by one or more FTC employees of the fraudulent scheme. FTC made payments to Harden, apparently using BOA's funds meant to finance the second sale to help Harden pay the sales price for the first sale, in contravention of FNTIC's own guidelines. There was also a disbursement to Hoskow, a convicted felon who was not identified on the HUD-1 settlement statement. Taken together, these facts support an inference that FTC was aware of and participated in the fraudulent scheme, as well as that FTC thereby fraudulently or dishonestly handled BOA's funds or documents in the Buie transaction.

In the Holmes transaction, there was again a counterfeit check in FTC's file as documentation of the purported down payment of the borrower, and FTC never deposited that check as would have been its normal practice, suggesting awareness by one or more FTC employees that the check was counterfeit. The funds for Holmes's supposed down payment actually came from one of FTC's own accounts. There was again a disbursement to Hoskow, who was not identified on the HUD-1 settlement statement, and Ellman admitted that other payees were not identified on the HUD-1 settlement statement. These facts suggest that FTC participated in the scheme and fraudulently or dishonestly handled BOA's funds or documents.

FNTIC likens the facts of this case to those of *New Freedom*, but the evidence in this case suggests that FTC both had knowledge of and participated in the fraudulent scheme as described above. In *New Freedom*, 281 Mich App at 83, this Court found no evidence that the closing agent committed any fraud or dishonesty in handling the lender's funds or documents because there was no evidence the closing agent was aware at closing that the borrower did not intend to occupy the property and because discrepancies in the HUD-1 settlement statement did not matter given that the document did not belong to the lender. And, with respect to another transaction in *New Freedom*, this Court found no evidence of fraud or dishonesty in handling the lender's funds or documents because there was no evidence that the closing agent was aware of the borrower's false assertion on the loan application that he intended to occupy the property. *Id*. at 84. By

contrast, there was extensive evidence here that one or more FTC employees had knowledge of and participated in the fraudulent scheme for the reasons discussed above at considerable length. *New Freedom* is therefore distinguishable. Given the evidence that these were sham transactions from the outset and that one or more FTC employees participated in the fraudulent schemes, a trier of fact could reasonably conclude that FTC dishonestly or fraudulently handled BOA's funds or documents. See *Walsh Securities, Inc v Cristo Prop Mgt, Ltd*, 858 F Supp 2d 402, 419 (D NJ, 2012), recon gtd on other grounds 2012 WL 3629045 (D NJ, 2012) (finding CPL coverage existed where there was a fraudulent scheme involving a straw buyer and an inflated appraised value of the property resulting in a mortgage loan for an amount far greater than the true value of the property, with full knowledge and participation by the closing attorneys in the fraudulent scheme); *First American Title Ins Co v Vision Mtg Corp, Inc*, 298 NJ Super 138, 144; 689 A2d 154 (1997) (*Vision Mtg*) (the closing agent's fraud eliminated the possibility of recouping a foreclosure loss through a deficiency proceeding against the mortgagor, given that the case involved "a sham transaction from the outset[]" and there was no bona fide mortgagor, thus triggering CPL liability).[2]

A genuine issue of material fact also exists concerning whether BOA's losses arose out of FTC's fraud or dishonesty. As discussed above, the CPLs require FNTIC to reimburse BOA if BOA's loss "arises out of" FTC's fraud or dishonesty in handling BOA's funds or documents. In general, the phrase "arises out of" does not mean proximate cause in the strict legal sense; rather, almost any causal connection will suffice if it is more than merely incidental or fortuitous. See *People v Johnson*, 474 Mich 96, 100-101; 712 NW2d 703 (2006); *Scott v State Farm Mut Auto Ins Co*, 483 Mich 1032, 1033-1035 (2009) (KELLY, C.J., concurring); *Schultz v Blue Cross Blue Shield*, unpublished opinion per curiam of the Court of Appeals, issued March 18, 2010 (Docket Nos. 288128, 288224, 288225, 288423), p 23, citing *Shinabarger v Citizens Mut Ins Co*, 90 Mich App 307, 313-314; 282 NW2d 301 (1979); *Lawyers Title Ins Corp v New Freedom Mtg Corp*, 285 Ga App 22, 30; 645 SE2d 536 (2007) ("[W]here a contract provides that a loss must 'arise out of' a specified act, it 'does not mean proximate cause in the strict legal sense' but instead encompasses almost any causal connection or relationship."). Here, a trier of fact could find that a causal connection exists between FTC's fraud or dishonesty and BOA's losses. It is reasonable to infer that if FTC had disclosed the true nature of the transactions, then BOA would not have funded the transactions. Even FTC's owner, Ellman, and its employee, Foster, claimed that they would not have closed the transactions if they had known of the counterfeit checks or the fraudulent nature of the transactions. And this causal connection is not negated by any deficiency in BOA's underwriting process. See *JP Morgan Chase Bank, NA v First American Title Ins Co*, 795 F Supp 2d 624, 632-633 (ED Mich, 2011), aff'd 750 F3d 573 (CA 6, 2014) (a lender's allegedly negligent underwriting is irrelevant in a breach of contract action under a CPL); *Lawyers Title Ins Corp*, 285 Ga App at 30 (concluding that indemnification was required under a CPL even if the lender's own negligence may have partially caused its loss).

---

[2] Although this Court is not bound by decisions of federal courts or courts of other states, we may consider them persuasive. *Mettler Walloon, LLC v Melrose Twp*, 281 Mich App 184, 221, n 6; 761 NW2d 293 (2008); *People v Jackson*, 292 Mich App 583, 595, n 3; 808 NW2d 541 (2011).

Accordingly, for the foregoing reasons, the trial court erred in granting FNTIC's motion for summary disposition on BOA's breach of contract claim under the CPLs in Docket No. 311798. Genuine issues of material fact exist concerning BOA's breach of contract claim. Therefore, a trial is required.

Next, the trial court in Docket No. 311798 erred in denying BOA's motion for summary disposition concerning FNTIC's counterclaims and affirmative defenses that were based on BOA's allegedly deficient underwriting. In its counterclaims, FNTIC alleged that BOA failed to employ objectively reasonable underwriting standards and that BOA failed to inform FNTIC that the Holmes and Buie loans did not meet objectively reasonable underwriting standards. FNTIC sought to rescind the CPLs on the grounds that BOA or its agents made fraudulent misrepresentations or omissions or on the basis of contractual mistake related to BOA's purported failure to use objectively reasonable underwriting standards. FNTIC also sought a declaratory judgment that FNTIC was not liable to BOA under the CPLs because of BOA's failure to follow objectively reasonable underwriting standards, as well as because BOA failed to give prompt notice of its claims and thereby prejudiced FNTIC. Further, in its affirmative defenses to BOA's complaint, FNTIC asserted that BOA's claims were barred by BOA's contributory or comparative negligence. The affirmative defenses also sought rescission on the same grounds as the counterclaim and asserted that BOA failed to satisfy the duty of good faith and fair dealing given the failure to use objectively reasonable underwriting standards.

FNTIC's counterclaims and affirmative defenses based on BOA's allegedly deficient underwriting fail as a matter of law. "Rescission of a contract is an equitable remedy to be exercised in the sound discretion of the trial court." *Schmude Oil Co v Omar Operating Co, GHO*, 184 Mich App 574, 587; 458 NW2d 659 (1990). In order to rescind a contract on the basis of fraudulent inducement, a party must show that:

> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage. [*Custom Data Solutions, Inc v Preferred Capital, Inc*, 274 Mich App 239, 243; 733 NW2d 102 (2006) (citations and internal quotation marks omitted).]

FNTIC is unable to satisfy the materiality requirement because BOA's underwriting practices are not material to the terms of the CPLs. See *Fifth Third Mtg Co v Chicago Title Ins Co*, 758 F Supp 2d 476, 487-488 (SD Ohio, 2010) (*Fifth Third I*), aff'd 692 F3d 507 (CA 6, 2012); *JP Morgan Chase*, 795 F Supp 2d at 632-633.

In *Fifth Third I*, 758 F Supp 2d at 486, the federal district court noted that the terms of the title policy at issue in that case did not mention underwriting practices or requirements. Therefore, the plaintiff-lender's underwriting guidelines were irrelevant under the terms of the policy. *Id*. Nonetheless, the defendant-title insurer filed a rescission counterclaim alleging that the plaintiff defrauded the defendant by implicitly representing that the plaintiff followed reasonable underwriting standards. *Id*. at 487. The federal district court reasoned that the title

policy did not mention underwriting or require the plaintiff to provide documentation of its underwriting standards. *Id*. The court found that if the underwriting standards were material to the defendant's decision to issue the policy, then the policy would have expressly provided that the underwriting would be subject to the defendant's approval. *Id*. at 488. The court thus granted summary judgment to the plaintiff with respect to the defendant's counterclaim for rescission. *Id*. In *Fifth Third Mtg Co v Chicago Title Ins Co*, 692 F3d 507, 511, 513 (CA 6, 2012) (*Fifth Third II*), the federal appellate court affirmed the decision in *Fifth Third I*, concluding that the title policy said nothing about the plaintiff's underwriting obligations and noting that the alleged misrepresentation in failing to disclose underwriting practices was not written into the policy itself. See also *JP Morgan Chase*, 795 F Supp 2d at 632-633 (concluding that the title insurer could not avoid its indemnification obligations under a CPL by arguing that the lender was negligent in underwriting the loan because such negligence was irrelevant and contributory negligence was not a valid defense in a breach of contract case). In the present case, the CPLs do not mention BOA's underwriting practices. Therefore, BOA's underwriting was not material to the terms of the CPLs. FNTIC thus cannot establish the materiality element required for rescission on the basis of fraudulent inducement.

FNTIC's reliance on the implied covenant of good faith and fair dealing is similarly misplaced. "It has been said that the covenant of good faith and fair dealing is an implied promise contained in every contract that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Hammond v United of Oakland, Inc*, 193 Mich App 146, 151-152; 483 NW2d 652 (1992) (citation and internal quotation marks omitted). "However, Michigan does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing." *Fodale v Waste Mgt of Mich, Inc*, 271 Mich App 11, 35; 718 NW2d 827 (2006). Moreover, the failure to refer to underwriting guidelines in a title policy does not constitute a gap to be filled by the implied duty of good faith and fair dealing when the policy is clear and specific regarding the parties' rights and obligations. *Fifth Third I*, 758 F Supp 2d at 490. FNTIC fails to identify any lack of clarity or specificity in the CPLs that warrants resort to the implied covenant in this case. See also *Van Arnem Co v Mfr Hanover Leasing Corp*, 776 F Supp 1220, 1223 (ED Mich, 1991) ("The implied covenant of good faith under Michigan law, as well as under the law of other jurisdictions having persuasive effect, neither overrides nor replaces any express contractual term.").

A contract may also be rescinded on the basis of a mutual mistake of the parties. *Shell Oil Co v Estate of Kert*, 161 Mich App 409, 421; 411 NW2d 770 (1987). A mutual mistake is "an erroneous belief, which is shared and relied on by both parties, about a material fact that affects the substance of the transaction." *Ford Motor Co v City of Woodhaven*, 475 Mich 425, 442; 716 NW2d 247 (2006). "A court need not grant rescission in every case in which the mutual mistake relates to a basic assumption and materially affects the agreed performance of the parties." *Lenawee Co Bd of Health v Messerly*, 417 Mich 17, 31; 331 NW2d 203 (1982). In the present case, there is no evidence that the parties shared and relied on a mutual mistake concerning BOA's underwriting standards nor that this mistake affected the substance of the transaction. Even accepting FNTIC's claim that it assumed BOA had agreed to use different or more stringent underwriting standards, there is no evidence from which to conclude that BOA shared this belief or that it affected the substance of the parties' transaction. Hence, there is no basis to rescind the CPLs on the ground of a mutual mistake of the parties. Accordingly, BOA is entitled to summary disposition with respect to FNTIC's counterclaim for rescission.

-10-

Summary disposition for BOA is also required for the portion of FNTIC's declaratory judgment counterclaim that alleges the same underlying theory as the rescission counterclaim, i.e., that BOA failed to employ objectively reasonable underwriting standards. Summary disposition shall also be granted to BOA on FNTIC's fifth affirmative defense asserting that BOA is entitled to rescind the CPLs due to fraudulent misrepresentations or contractual mistake, FNTIC's 11th affirmative defense asserting that BOA failed to satisfy the duty of good faith and fair dealing when it approved loans that did not meet objectively reasonable underwriting standards, and FNTIC's 12th affirmative defense asserting that BOA's claims are barred by contributory or comparative negligence. See *JP Morgan Chase*, 795 F Supp 2d at 633 (noting in the context of CPL claims that "contributory negligence is not a valid defense in a breach of contract case."), citing *Nelson v Northwestern Savings & Loan Ass'n*, 146 Mich App 505, 509; 381 NW2d 757 (1985).

BOA is also entitled to summary disposition with respect to the portion of FNTIC's declaratory judgment counterclaim asserting that BOA failed to provide prompt notice of its damages claims to FNTIC as required by the CPLs and that FNTIC was thereby prejudiced. Paragraph E of the "conditions and exclusions" section of the CPLs provides as follows: "Claims shall be made promptly to [FNTIC] . . . . When the failure to give prompt notice shall prejudice [FNTIC], then liability of [FNTIC] hereunder shall be reduced to the extent of such prejudice."

> Provisions in liability insurance contracts requiring the insured to give the insurer immediate or prompt notice of accident or suit are common, if not universal. The purpose of such provisions is to allow the insurer to make a timely investigation of the accident in order to evaluate claims and to defend against fraudulent, invalid, or excessive claims. [*Wendel v Swanberg*, 384 Mich 468, 477; 185 NW2d 348 (1971).]

It is the insurer's burden to demonstrate prejudice arising from the lack of prompt notice. *Id*. at 478. "[P]rejudice will be found if the insurer demonstrates that a delay in providing notice materially impaired the insurer's ability to contest its liability to an insured." *Triple Investment Group, LLC v Hartford Steam Boiler Inspection & Ins Co*, 71 F Supp 3d 733, 740 (ED Mich, 2014). The insurer is not required to prove that it would have avoided liability but for the delay. *Id*.

> An insurer must do more than simply claim that evidence was lost, physically altered, or has otherwise become unavailable and that witnesses have died, disappeared, or their memories have faded. Instead, an insurer must establish what is in fact lost by the missing evidence, how this prejudices its position, and why information available from other sources is inadequate.

> The question of prejudice is generally to be left to the trier of fact. However, where the facts are so clear that one conclusion only is reasonably possible, the question is one of law.

> In determining whether an insurer's position has actually been prejudiced by the insured's untimely notice, courts consider whether the delay has materially impaired the insurer's ability: (1) to investigate liability and damage issues so as

-11-

to protect its interests; (2) to evaluate, negotiate, defend, or settle a claim or suit; (3) to pursue claims against third parties; (4) to contest the liability of the insured to a third party; and (5) to contest its liability to its insured. [*Id.* (citations and internal quotation marks omitted).]

In this case, the parties agree that BOA became aware of the fraudulent scheme at some point in 2006. The parties disagree about when BOA provided notice of its claim to FNTIC. BOA argues that it provided notice of its CPL claims to FNTIC in February 2008. FNTIC argues, however, that it did not receive notice until BOA commenced this action on October 20, 2010. FNTIC acknowledges that BOA provided written notice of potential claims to FNTIC in February 2008 but asserts that BOA never provided further details regarding its potential claims in response to FNTIC's April 15, 2008 (for the Buie loan) and June 12, 2008 (for the Holmes loan) written requests for more complete descriptions of the basis of BOA's claims. However, FNTIC's own letters from April and June of 2008 reflect that BOA's February 2008 claim letters provided notice of both the property and the borrower at issue for each loan, that BOA was alleging that FTC failed to comply with BOA's written instructions, and that FNTIC committed fraud or dishonesty in handling BOA's funds. FNTIC fails to articulate why this was insufficient to provide the notice required by the CPLs. We conclude that BOA's February 2008 claim letters provided the requisite notice of BOA's claims to FNTIC such that FNTIC could commence its investigation.

FNTIC has failed to demonstrate a genuine issue of material fact as to whether it was prejudiced by BOA's delay in providing notice. In his deposition, FNTIC's corporate representative, David Golub, referred vaguely to the fading of memories and the loss of documents and asserted a lack of knowledge about whether the brokers who produced the loans were contractually obligated to repurchase the loans. FNTIC suggests this loss of documents and fading of memories may have impaired FNTIC's right of subrogation under the CPLs. FNTIC also notes the deposition testimony of BOA's corporate representative, Vicky Olson, indicating that BOA's original loan files and the files of its mortgage brokers had been lost. FNTIC's assertions fail to demonstrate with a sufficient level of specificity "what is in fact lost by the missing evidence, how this prejudices its position, and why information available from other sources is inadequate." *Triple Investment Group, LLC*, 71 F Supp 3d at 740. In addition, the purported failure of BOA's senior underwriter, Shirley Robert, to remember at deposition certain aspects of BOA's underwriting training or procedures does not establish prejudice given the irrelevancy of BOA's underwriting practices as explained earlier. Accordingly, BOA is entitled to summary disposition on this aspect of FNTIC's declaratory judgment counterclaim.

In Docket No. 316538, BOA argues that the trial court erred in denying BOA's motion for summary disposition on its CPL claims against FNTIC. FNTIC, on the other hand, contends that BOA's CPL claims fail as a matter of law, thereby entitling FNTIC to summary disposition in its favor on this basis even if, as discussed below, this Court reverses the trial court's determination regarding the applicability of the full credit bid rule on the basis of which the trial court granted summary disposition to FNTIC. We conclude that genuine issues of material fact exist precluding summary disposition for either party on BOA's CPL claims. The language of the CPLs issued by FNTIC's predecessor, LTIC, in Docket No. 316538 is identical in all relevant respects to the language of the CPLs issued by FNTIC in Docket No. 311798. There is evidence demonstrating a genuine issue of material fact concerning whether the closing agent in Docket

No. 316538, Wolverine Title Agency, Inc. (WTA), was aware of and participated in the fraudulent scheme and whether BOA sustained actual loss arising out of WTA's fraud or dishonesty in handling BOA's funds or documents.

With respect to BOA's loan to Giles Marks (the Marks loan or transaction), WTA closed Marks's purchase from Michigan Land Development (MLD) of 9430 Highland Court, Davison, Michigan, in January 2006 for a purported sales price of $1,150,000.00, with BOA loaning $920,000.00 to fund the purchase. This property was purported to be Marks's intended residence. The HUD-1 settlement statement indicated that Marks made a down payment of $235,086.59. The loan went into default because the loan payment due on December 1, 2006, was not made. Warranty deeds reflect that this transaction was a same-day property flip. MLD purchased the property from Michael Jarvinen and Lamis Jarvinen on January 11, 2006, for $548,000.00. On the same date, MLD sold the property to Marks for $1,150,000.00. Foster, a WTA employee, notarized both warranty deeds in the flip transaction. WTA prepared a title commitment dated August 8, 2005, signed by WTA's owner, Amira Butler, showing MLD as the owner of the property even though the Jarvinens owned the property on that date and MLD did not obtain title to this property until January 11, 2006, the date of the Marks closing. Butler invoked the Fifth Amendment's privilege against compelled self-incrimination when questioned at deposition about WTA's knowledge of the same-day property flip.

In an affidavit, Marks explained that he was approached by loan officer James Lamar about buying this property as an investment opportunity. Marks did not intend to occupy the property and was told that he would not be responsible for making loan payments. Marks did not make the down payment shown on the HUD-1 settlement statement. At his deposition, Marks confirmed that he had provided the facts stated in his affidavit. Butler again invoked the Fifth Amendment when questioned about these matters. The facts concerning this fraudulent scheme are also set forth in a felony information against Thomas Keller, the principal of MLD, and a guilty plea agreement filed in the United States District Court for the Eastern District of Michigan, in which Keller pleaded guilty to one count of financial institution fraud, 18 USC 1344. The plea agreement set forth the following factual basis for the plea:

> [MLD] purported to be a real estate investment company doing business in the State of Michigan. Defendant Thomas Keller operated MLD and used it to facilitate the purchase and sale of properties with fraudulently inflated appraised values and false buyer asset and income information.
>
> From in or about December 2005 through January 2006, Defendant Thomas Keller devised a scheme to defraud Bank of America, a financial institution in the Eastern District of Michigan. On January 11, 2006, Keller used MLD to purchase 9430 Highland Court in Davison, Michigan for $548,000. On that same day, using a false and inflated appraisal for the property, Keller sold 9430 Highland Court to a straw buyer for $1,150,000. In addition to the inflated appraisal Keller help[ed] arrange for the straw buyer's asset and income information to be grossly inflated on the loan application. The lending institution was Bank of America which relied on the material and false appraisal and asset and income information in approving and disbursing the loan. The resulting

-13-

illegally gained proceeds were split between Keller and others involved in the fraud.

Although Keller is pleading guilty to one instance of financial institution fraud, he admits that he was involved in other instances of fraudulent conduct which have been used as relevant conduct in calculating his sentencing guidelines and for which he will be responsible for paying restitution. The parties agree that the fraud loss will be more than $1 million and less than $2.5 million.

WTA's disbursement summary indicated that Butler's company, Centurion Land Management (CLM), was paid $236,586.59 as part of the Marks closing. This disbursement was not shown on the HUD-1 settlement statement. Butler invoked the Fifth Amendment in response to deposition questions about this payment to CLM. An appraisal later obtained by BOA indicated that the true value of the property on the date of the origination appraisal was $370,000.00. BOA sold the property for $189,000.00 in April 2010 in an effort to mitigate its losses.

As for BOA's loan to Nicklas Williams (the Williams loan or transaction), on January 13, 2006, WTA closed Williams's purchase of 3231 Rivershyre Parkway, Davison, Michigan, from MLD for the supposed sales price of $1.2 million, with BOA loaning $960,000.00 to fund the purchase. The HUD-1 settlement statement indicated that Williams made a down payment of $244,776.71. Williams signed a document indicating that he intended to occupy the property. This transaction was supported by an appraisal that valued the property at $1.2 million. The Williams loan went into default because the November 1, 2006 loan payment was not made.

Public records reflect that the Williams transaction was a same-day property flip as well. Warranty deeds show that MLD purchased the property from Brad Townsend and Kyra Townsend for $469,000.00 on January 13, 2006; on the same date, MLD sold the property to Williams for $1.2 million. WTA assisted in the preparation of both warranty deeds, with Foster notarizing both deeds. WTA prepared a title commitment for this property, signed by Butler and dated December 12, 2005, showing MLD as the owner of the property, even though the Townsends owned the property on that date and MLD did not obtain title to the property until January 13, 2006. Butler invoked the Fifth Amendment when questioned about this matter. WTA's disbursement summary indicates that Butler's company, CLM, was paid $281,276.71 as part of the Williams transaction, but this payment was not shown on the HUD-1 settlement statement. The disbursement summary also reflects other payments by WTA that are not shown on the HUD-1 settlement statement, including a payment of $20,000.00 to WTA "3 MOS PAYMENT[.]" Williams owed $19,646.70 to BOA for the first three months of loan payments. Again, Butler invoked the Fifth Amendment when questioned about these payments.

In his deposition, Williams admitted that the information about his income and assets on the loan application was overstated, that he only saw the property one time and never entered it, that he viewed the transaction as an investment, that he was paid $20,000.00 to make loan payments, and that he did not have the money needed to make the down payment. Butler invoked the Fifth Amendment when questioned about these facts. BOA ultimately obtained another appraisal indicating that the property was worth $385,000.00 on the date of the

origination appraisal. After foreclosure, BOA sold the property for $190,000.00 in an effort to mitigate its losses.

This evidence presents a material factual dispute concerning whether WTA fraudulently or dishonestly handled BOA's funds or documents. The Marks transaction was a same-day property flip with an inflated appraisal, a significantly higher sum for the second sale, and misrepresentations on the HUD-1 settlement statement indicating that Marks made a substantial down payment. WTA assisted in preparing the warranty deeds for both sides of the flip transaction, with Foster notarizing both deeds. WTA prepared a title commitment incorrectly showing MLD as the owner of the property when the Jarvinens still owned it. Another participant in the scheme has pleaded guilty to financial institution fraud in relation to this loan. WTA disbursed $236,586.59 to Butler's company as part of the Marks transaction, a disbursement that was not shown on the HUD-1 settlement statement.

Likewise, the Williams transaction was a same-day property flip with an inflated appraised value for the property and overstated information concerning Williams's income and assets on the loan application. Williams did not intend to live on the property as his primary residence. WTA prepared the warranty deeds for both sides of the flip transaction, with Foster notarizing both deeds, and WTA prepared a title commitment that incorrectly listed MLD as the owner of the property when it was still owned by the Townsends. WTA made disbursements that were not shown on the HUD-1 settlement statement, including a disbursement of $281,276.71 to Butler's company and a disbursement to WTA of $20,000.00 to pay the first three months of Williams's loan payments.

Although the other evidence described above suffices to support BOA's claims, we note that, in a civil action, Butler's invocation of the Fifth Amendment privilege against compulsory self-incrimination gives rise to a legitimate inference that Butler was engaged in criminal activity. *Baxter v Palmigiano*, 425 US 308, 318; 96 S Ct 1551; 47 L Ed 2d 810 (1976); *Phillips v Deihm*, 213 Mich App 389, 400; 541 NW2d 566 (1995); *Davis v Mut Life Ins Co of New York*, 6 F3d 367, 384 (CA 6, 1993). BOA is thus entitled to an adverse inference that WTA was complicit in the fraudulent scheme given Butler's assertion of the Fifth Amendment.

Taken together, the evidence summarized above supports an inference that WTA was aware of and participated in the fraudulent scheme for both the Marks and the Williams transactions, and that WTA thereby fraudulently or dishonestly handled BOA's funds or documents. *New Freedom* is distinguishable because the evidence here suggests that WTA had knowledge of and participated in the fraudulent schemes in the ways described above. Given the evidence that these were sham transactions from the outset and that WTA personnel participated in the fraudulent schemes, a trier of fact could reasonably conclude that WTA dishonestly or fraudulently handled BOA's funds or documents. See *Walsh Securities, Inc*, 858 F Supp 2d at 419; *Vision Mtg Corp, Inc*, 298 NJ Super at 144. And, a material factual dispute exists regarding whether BOA's losses arose out of WTA's fraud or dishonesty, i.e., whether there is a causal connection between WTA's fraud or dishonesty and BOA's losses. See *Johnson*, 474 Mich at 100-101; *Scott*, 483 Mich at 1033-1035 (KELLY, C.J., concurring); *Lawyers Title Ins Corp*, 285 Ga App at 30. It is reasonable to infer that if WTA had disclosed the true nature of the transactions, then BOA would not have funded the transactions. As discussed above, such a causal connection is not negated by any deficiency in BOA's

underwriting process.  See *JP Morgan Chase*, 795 F Supp 2d at 632-633; *Lawyers Title Ins Corp*, 285 Ga App at 30.

Accordingly, for the foregoing reasons, the trial court erred in granting FNTIC's motion for summary disposition on BOA's breach of contract claim under the CPLs in Docket No. 316538.  Genuine issues of material fact exist concerning BOA's breach of contract claim.  Therefore, a trial is required.

Although BOA presented sufficient evidence to avoid summary disposition in favor of FNTIC on BOA's CPL claims, we are not convinced by BOA's argument in Docket No. 316538 that BOA is entitled to summary disposition in its favor on its CPL claims.  It is for the trier of fact to assess credibility; a jury may choose to credit or discredit any testimony.  *Taylor v Mobley*, 279 Mich App 309, 314; 760 NW2d 234 (2008), citing *Kelly v Builders Square*, 465 Mich 29, 38-39; 632 NW2d 912 (2001).  That is, a jury is free to disbelieve and to discredit the testimony offered in support of a plaintiff's case.  *Taylor*, 279 Mich App at 314.  A trial court in ruling on a summary disposition motion may not weigh evidence, *Hines v Volkswagen of America, Inc*, 265 Mich App 432, 437; 695 NW2d 84 (2005), or make credibility determinations, *White v Taylor Distrib Co, Inc*, 275 Mich App 615, 625; 739 NW2d 132 (2007), aff'd 482 Mich 136 (2008).  As discussed, much of the evidence that supports BOA's claims is comprised of witness testimony.  It is for the trier of fact to decide whether to credit this testimony.  Also, causation is generally a question for the trier of fact, although it may be decided by the court as a matter of law if no issue of material fact exists.  *Holton v A+ Ins Assoc, Inc*, 255 Mich App 318, 326; 661 NW2d 248 (2003).  BOA fails to demonstrate that there are no material issues of fact concerning whether CPL coverage is triggered in this case.  It is for the trier of fact to assess the evidence at trial and to determine whether BOA's losses arose out of WTA's fraud or dishonesty in handling BOA's funds or documents; the issue is not amenable to resolution as a matter of law.  Accordingly, BOA is not entitled to summary disposition on its CPL claims.

In Docket No. 316538, FNTIC suggests other alternative grounds on which to grant summary disposition to FNTIC.  Because, as discussed below, the trial court's grant of summary disposition to FNTIC on the basis of the full credit bid rule must be reversed, and because FNTIC raised in the trial court the alternative grounds that it now asserts on appeal, we will address those alternative grounds for granting summary disposition to FNTIC.  See *Peterman v Dep't of Natural Resources*, 446 Mich 177, 183; 521 NW2d 499 (1994) (a litigant who raised an issue below should not be punished for the trial court's failure to address the issue).

FNTIC's first alternative ground for granting summary disposition in its favor is that BOA suffered no actual loss because it sold the loans "without recourse" to third-party investors on the secondary mortgage market.  FNTIC notes that BOA relinquished "all the right, title, and interest" in the mortgage loans.  FNTIC argues that the mortgage loan purchase agreements (MLPAs) did not require BOA to repurchase the loans due to a title agent's fraud; therefore, FNTIC reasons, any loss it suffered did not arise out of an act protected by the CPLs.  FNTIC suggests that BOA voluntarily repurchased the loans from the third-party investors and that any loss was thus due to BOA's own voluntary actions.  FNTIC contends that BOA cannot recover in a breach of contract action payments that BOA voluntarily made.

-16-

In responding to this argument below, BOA explained that it repurchased the loans from the third-party investors after discovering that the loans were fraudulent based on BOA's contractual obligation to do so. Under the MLPAs, BOA sold the loans to Banc of America Funding Corporation (BAFC). As part of the MLPAs, BOA made representations and warranties, including that there was "no default, breach, violation or event of acceleration existing under the [mortgages or mortgage notes]." BOA further explained that it was required to cure the breach or repurchase a defective mortgage loan when it discovered a breach of the representations and warranties in the MLPAs that had a material adverse effect on the value of the loan. BAFC then sold "without recourse" all of BAFC's right, title, and interest in the loans that it purchased from BOA, including BAFC's rights under the MLPAs, to trustees for the benefit of certificate holders of mortgage-backed securities. The pooling and servicing agreements (PSAs) governing the sales of the loans by BAFC to the trustees contain language effectively providing that the representations and warranties in the MLPAs survived delivery of the mortgage files to the trustees, thereby carrying over BOA's obligation to repurchase defective mortgage loans after the loans were sold to the trustees under the PSAs.

In May 2007, BOA referred the loans at issue for further review after learning of potential fraud. Less than 30 days after this internal review was initiated, BOA repurchased the loans at issue. Judy Lowman, who was, at the time of these transactions, a BOA vice-president transaction manager working with mortgage-backed securities, testified that BOA did not have a choice about whether to repurchase the loans; she indicated that the repurchase was due to a breach of the representations in light of the fraud in connection with the origination of the loans and that BOA was contractually obligated to repurchase the loans. BOA prepared repurchase reports for each of the loans that also indicate that BOA repurchased the loans due to the fraudulent nature of the loans. The repurchase reports set forth BOA's internal findings that the loans were fraudulent and indicate that Lowman agreed that the loans should be repurchased. After Lowman authorized the repurchases, a BOA employee calculated the amounts owed to the investors, and the amounts were disbursed to the investors.

FNTIC identifies no evidence and presents no argument disputing that BOA repurchased the loans at issue after learning of the fraud associated with those loans. FNTIC instead contends that BOA voluntarily repurchased the loans and therefore cannot recover in this breach of contract action for payments that it voluntarily made. But the evidence summarized above provides support for BOA's contention that it repurchased the defective loans due to what BOA understood to be its contractual obligation to do so. Moreover, in arguing that BOA suffered no actual loss because it voluntarily repurchased the loans, FNTIC again fails to appreciate that the "arises out of" language in the CPLs does not require proximate cause in the strict legal sense, and that, rather, almost any causal connection that is more than incidental or fortuitous is sufficient. *Johnson*, 474 Mich at 100-101; *Scott*, 483 Mich at 1033-1035 (KELLY, C.J., concurring); *Lawyers Title Ins Corp*, 285 Ga App at 30. As discussed earlier, evidence exists of a causal connection between WTA's fraud or dishonesty and BOA's losses. The fact that BOA sold the loans and then later repurchased the loans after concluding that it was contractually obligated to do so does not require a conclusion as a matter of law that the requisite causal connection has been negated or rendered incidental or fortuitous. See generally *Holton*, 255 Mich App at 326 (causation is typically a question for the trier of fact). FNTIC cites no authority establishing that the existence of other possible causes precludes a conclusion that a lender's losses arose out of a closing agent's fraud or dishonesty under a CPL claim. Moreover, it has

been recognized that an entity may sustain actual losses for the purpose of CPL claims if it repurchased loans that it had previously sold. See *Walsh Securities, Inc*, 858 F Supp 2d at 419 (noting, in the context of CPL claims, that the plaintiff, a mortgage loan wholesaler, "would only have sustained actual losses if it repurchased the twenty-one aforementioned mortgage loans."). Accordingly, FNTIC has failed to establish that BOA's sale and subsequent repurchase of the loans requires a conclusion as a matter of law that BOA suffered no actual losses that arose out of WTA's fraud or dishonesty.

As a related alternative ground for granting summary disposition in its favor, FNTIC argues that BOA lacks standing to make claims under the CPLs because BOA sold its interest in the CPLs to investors and no evidence exists that BOA ever repurchased its interest in the CPLs. We disagree. "[A] litigant has standing whenever there is a legal cause of action." *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 372; 792 NW2d 686 (2010). FNTIC fails to explain why, even if BOA had not repurchased the loans, BOA would lack standing to pursue the CPL claims on behalf of the third-party investors in its capacity as a servicer of the loans. FNTIC identifies no language in the CPLs that required BOA to retain its loans in order to bring claims under the CPLs. Also, BOA repurchased the loans. FNTIC asserts that BOA's repurchase of the loans did not return to BOA the interest in the CPLs, but FNTIC fails to cite authority establishing that the interest in a CPL is not reacquired when a loan is repurchased.

> A party may not leave it to this Court to search for authority to sustain or reject its position. An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give issues cursory treatment with little or no citation of supporting authority. Argument must be supported by citation to appropriate authority or policy. An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue. [*Peterson Novelties, Inc v City of Berkley*, 259 Mich App 1, 14; 672 NW2d 351 (2003) (citations and internal quotation marks omitted).]

Missing from FNTIC's cursory argument is any articulation of why BOA's repurchase of the loans excluded any rights under the CPLs that had been transferred when BOA sold the loans. There is no evidence that the trustees retained any rights associated with the loans after BOA repurchased the loans, such as the ability to pursue CPL claims against FNTIC after BOA repurchased the loans. No document has been presented explicitly saying that the interest in the CPLs was transferred back to BOA, but this does not preclude a conclusion that, in these circumstances, BOA reacquired any rights under the CPLs when it repurchased the loans. Cf. *Burkhardt v Bailey*, 260 Mich App 636, 658; 680 NW2d 453 (2004) (If "a legal instrument fails to create an assignment but the circumstances clearly establish the assignor's intent to presently transfer an interest, an equitable assignment may arise.").

Next, FNTIC asserts that an alternative ground for denying BOA's request for summary disposition in Docket No. 316538 is that FNTIC was prejudiced by BOA's failure to provide prompt notice of its claims as required by the CPLs. This issue is not properly before this Court because FNTIC did not file a cross-appeal and is requesting greater relief than it received below. The trial court dismissed FNTIC's counterclaims, which included FNTIC's declaratory judgment counterclaim asserting in relevant part that FNTIC was prejudiced by BOA's failure to provide

prompt notice of its CPL claims. Although an appellee need not file a cross-appeal in order to assert an alternative ground for affirmance, "an appellee that has not sought to cross-appeal cannot obtain a decision more favorable than was rendered by the lower tribunal." *ABATE v Public Serv Comm*, 192 Mich App 19, 24; 480 NMW2d 585 (1991). In this argument, FNTIC is effectively seeking to reverse in part the trial court's dismissal of FNTIC's declaratory judgment counterclaim, which would thereby result in a decision more favorable to FNTIC than was rendered below. Therefore, because FNTIC did not file a cross-appeal, FNTIC may not properly seek a partial reversal of the order dismissing its counterclaims by making the argument at issue.

But, even if this argument were properly before this Court, we would conclude that FNTIC's argument is devoid of merit. Condition and Exclusion (F) of the CPLs in Docket No. 316538 contains the following notice provision: "Claims shall be made promptly to [FNTIC's predecessor, LTIC] . . . . When the failure to give prompt notice shall prejudice [LTIC], the liability of [LTIC] hereunder shall be reduced to the extent of such prejudice." As discussed earlier, it is FNTIC's burden to demonstrate prejudice arising from the lack of prompt notice. *Wendel*, 384 Mich at 478.

> An insurer must do more than simply claim that evidence was lost, physically altered, or has otherwise become unavailable and that witnesses have died, disappeared, or their memories have faded. Instead, an insurer must establish what is in fact lost by the missing evidence, how this prejudices its position, and why information available from other sources is inadequate. [*Triple Investment Group, LLC*, 71 F Supp 3d at 740.]

FNTIC argues that BOA waited more than four years after learning of the alleged fraud to notify FNTIC of the CPL claims. In suggesting that it was prejudiced, FNTIC references BOA's destruction of its original loan files, the borrowers' destruction of their copies of documents, the cessation of operations by WTA and by BOA's broker, the disappearance of WTA's original files for these transactions, and the deaths of one LTIC employee and one WTA employee. FNTIC has failed to demonstrate a genuine issue of material fact that it was prejudiced by BOA's delay in providing notice. FNTIC asserts in a conclusory fashion that the loss of evidence and deaths of witnesses have prejudiced FNTIC's ability to investigate liability and damages and impaired its ability to evaluate or settle BOA's claims. FNTIC's assertions fail to demonstrate with a sufficient level of specificity "what is in fact lost by the missing evidence, how this prejudices its position, and why information available from other sources is inadequate." *Id*. Accordingly, BOA was properly granted summary disposition on the aspect of FNTIC's counterclaim asserting prejudice arising from the alleged failure to give prompt notice.

FNTIC also argues that BOA impaired FNTIC's right of subrogation by failing to confirm the value of the properties and the borrowers' ability to repay the loans and by approving the loans without independently verifying the accuracy of the inflated appraisals. Condition and Exclusion (B) of the CPLs provided that FNTIC's predecessor, LTIC, was subrogated to all rights and remedies that BOA would have had and provided for the reduction of LTIC's liability to the extent that BOA knowingly and voluntarily impaired the value of the subrogation right. FNTIC fails to cite any pertinent authority in support of its argument on this issue and also fails to present an argument that BOA *knowingly and voluntarily* impaired the subrogation right as required to reduce FNTIC's liability under the language of the CPLs.

-19-

FNTIC's cursory appellate presentation results in abandonment of this issue. *Peterson Novelties, Inc*, 259 Mich App at 14. In any event, FNTIC's argument is devoid of merit. There is no evidence that BOA *knowingly and voluntarily* impaired the value of FNTIC's subrogation right. BOA's purported failure to confirm the value of the properties or the borrowers' ability to repay the loans constituted at most mere negligence. FNTIC's suggestion that the value of its subrogation right was impaired because BOA made full credit bids for the properties, thereby precluding FNTIC from pursuing deficiency judgments against the borrowers, is unsupported. FNTIC identifies no evidence that the borrowers possessed assets from which any deficiency judgments could be collected. It is thus groundless for FNTIC to assert that BOA's full credit bids impaired the value of FNTIC's subrogation right.

### III. FULL CREDIT BID RULE

Next, BOA argues in Docket Nos. 311798 and 316538 that the trial court in each case erred in concluding that the full credit bid rule barred one or both of BOA's breach of CPL claims. We agree.

Before addressing the substance of this issue, we note that in Docket No. 316538, the trial court had initially rejected FNTIC's argument that the full credit bid rule applied but later revisited that determination and agreed with FNTIC's argument. BOA contends that the trial court lacked authority to do this because the trial court had already denied FNTIC's motion for summary disposition on this issue and FNTIC's motion for reconsideration of that decision. But, we agree with FNTIC that the trial court had authority to revisit its earlier determination concerning the applicability of the full credit bid rule. MCR 2.604(A) provides that "an order or other form of decision adjudicating fewer than all the claims, or the rights and liabilities of fewer than all the parties, does not terminate the action as to any of the claims or parties, and the order is subject to revision before entry of final judgment adjudicating all the claims and the rights and liabilities of all the parties." "As a general matter, courts are permitted to revisit issues they previously decided, even if presented with a motion for reconsideration that offers nothing new to the court." *Hill v City of Warren*, 276 Mich App 299, 307; 740 NW2d 706 (2007). A party is permitted to file more than one motion for summary disposition. MCR 2.116(E)(3); *Dep't of Social Servs v Baayoun*, 204 Mich App 170, 176-177; 514 NW2d 522 (1994). The denial of a motion for summary disposition does not preclude such a motion on the same ground from being granted later in the same case. See *Goodrich v Moore*, 8 Mich App 725, 728; 155 NW2d 247 (1967). In this case, although the trial court exhibited a lack of awareness that it had previously denied FNTIC's motion for reconsideration of the order denying FNTIC's first motion for summary disposition, the trial court nonetheless had authority to revisit its previous determination regarding the applicability of the full credit bid rule. A final judgment had not yet been entered, and FNTIC had filed another motion for summary disposition again raising the issue of the full credit bid rule as permitted by court rule. Thus, the trial court possessed authority to revisit the issue.

Nevertheless, we agree with BOA that the trial courts in Docket Nos. 311798 and 316538 erred in concluding that the full credit bid rule barred some of BOA's breach of CPL claims. Our Supreme Court recently provided guidance in this area of the law. In *FATCO*, 499 Mich at ___; slip op at 11-12, our Supreme Court explained the full credit bid rule as follows:

A mortgagee who bids on the property at a foreclosure sale is not required to bid the full amount of the debt. If a mortgagee bids a lower amount, it may then pursue a deficiency judgment against the debtor, subject to the limitations set forth in the anti-deficiency statute [MCL 600.3280]. However, a mortgagee can make a full credit bid—i.e., a credit bid in an amount equal to the unpaid principal and interest of the mortgage debt, together with costs, fees, and other expenses of the foreclosure. If a mortgagee's full credit bid is successful, i.e., results in the acquisition of the property, the lender pays the full outstanding balance of the debt and costs of the foreclosure to itself and takes title to the security property, releasing the borrower from further obligations under the defaulted note.

Under the full credit bid rule, a lender who takes title following a full credit bid is precluded for purposes of collecting its debt from later claiming that the property is actually worth less than the bid. This is because the mortgagee who enters such a bid is deemed to have irrevocably warranted that the value of the security foreclosed upon was equal to the outstanding indebtedness and not impaired. Thus, the full credit bid rule makes a properly conducted nonjudicial foreclosure sale the dispositive device through which to resolve the question of value. And, in its most direct application, the rule bars a mortgagee who takes title at a nonjudicial foreclosure sale following a full credit bid from pursuing a deficiency judgment against the mortgagor. [Citations and internal quotation marks omitted.]

In *FATCO*, our Supreme Court held "that the *New Freedom* panel erred to the extent it held that the full credit bid rule bars contract claims against nonborrower third parties, such as defendants in this case. Therefore, the Court of Appeals in the instant case erred by concluding that plaintiff's full credit bids barred its contract claims against the nonborrower third-party defendants." *Id*. at ___; slip op at 2. Our Supreme Court in *FATCO* further explained as follows:

[T]he full credit bid rule is related to the anti-deficiency statute, and its purpose is merely to resolve the question of the value of the property for purposes of determining whether the mortgage debt was satisfied. It is not concerned with the relationship between the lender and third parties and was simply not intended to cut off all remedies a mortgagee might have against nonborrower third parties.

\* \* \*

In sum, although the full credit bid rule is not a creature of statute, we are cognizant of its relationship to the foreclosure by advertisement and anti-deficiency statutes. Those statutes are carefully designed to govern the relationship between, and establish the rights and liabilities of, the mortgagee and mortgagor – not nonborrower third parties. . . . [W]e conclude that there is no justification for extending the protections of the rule to alter the contractual rights and liabilities between a mortgagee and nonborrower third parties. Therefore, we hold that the full credit bid rule does not bar contract claims by a mortgagee

-21-

against nonborrower third parties, and we overrule *New Freedom* to the extent that it conflicts with our decision today. [*Id*. at ___; slip op at 19, 21-22.]

In Docket No. 311798, the trial court partially premised its grant of summary disposition to FNTIC on the fact that BOA made a full credit bid in the Buie transaction, and in Docket No. 316538, the trial court likewise granted summary disposition to FNTIC on the ground that BOA made full credit bids in the Marks and Williams transactions. In other words, the trial court in each lower court action applied the full credit bid rule to bar one or both of BOA's CPL claims. As the above quotations from *FATCO* reflect, however, our Supreme Court has now clarified that the full credit bid rule is inapplicable to a mortgagee's claims against nonborrower third parties. Indeed, the claims at issue in the present cases, i.e., breach of CPL claims against a title insurer related to a closing agent's fraud or dishonesty, were among the types of claims at issue in *FATCO* and with respect to which our Supreme Court held that the full credit bid rule was inapplicable. See *FATCO*, 499 Mich App at ___; slip op at 21-22. Therefore, the trial courts in the present cases erred in holding that some of BOA's breach of CPL claims against FNTIC were barred by the full credit bid rule.

## IV. CASE EVALUATION, ATTORNEY FEES, & COSTS

In light of our resolution of the above issues, we need not address the substance of the remaining issues raised by BOA on appeal, which are raised in Docket Nos. 312426 and 313797, and which arise from the same lower court file as Docket No. 311798. Specifically, BOA argues that the trial court erred in striking the case evaluation award. The trial court's decision to strike the case evaluation award was premised on the fact that it had granted summary disposition to FNTIC with respect to BOA's claims against FNTIC and its view that it was thus inappropriate for the case evaluation to have been held on the dismissed claims. Because we have concluded that the trial court erred in granting summary disposition to FNTIC, it follows that the trial court's decision to strike the case evaluation award premised on what we have concluded was an erroneous grant of summary disposition to FNTIC must be vacated. Thus, it is unnecessary for us to address whether the decision to strike the case evaluation award would otherwise have been appropriate if the grant of summary disposition had been proper.

Likewise, we need not address the substance of BOA's arguments challenging the award of attorney fees to FNTIC. The offer-of-judgment sanctions at issue here were imposed on the ground that the order granting summary disposition to FNTIC was more favorable to FNTIC, the offeror, than the average offer, thereby entitling FNTIC to recover its costs and attorney fees under MCR 2.405(D). But, because, as discussed earlier, we are reversing the order granting summary disposition to FNTIC, the award of sanctions premised on that grant of summary disposition must be vacated, thereby making it unnecessary to address the specific issues concerning sanctions raised by BOA. Cf. *McManamon v Redford Charter Twp*, 273 Mich App 131, 141; 730 NW2d 757 (2006) (" '[I]t is the ultimate verdict that the parties are left with after appellate review is complete that should be measured against the mediation evaluation to determine whether sanctions should be imposed on a rejecting party pursuant to MCR 2.403(O).' "), quoting *Keiser v Allstate Ins Co*, 195 Mich App 369, 374-375; 491 NW2d 581 (1992). In other words, because we are reversing the order granting summary disposition to FNTIC, this action has not yet proceeded to verdict, and the sanctions award must therefore be vacated.

# V. CONCLUSION

In sum, in Docket No. 311798, we reverse the order granting summary disposition to FNTIC regarding BOA's breach of contract claim, reverse the order denying BOA's motion for summary disposition concerning FNTIC's counterclaims and affirmative defenses, and remand this matter for further proceedings consistent with this opinion. In Docket Nos. 312426 and 313797, we vacate the order striking the case evaluation award and the orders awarding costs and attorney fees to FNTIC. In Docket No. 316538, we reverse the order granting summary disposition to FNTIC regarding BOA's breach of contract claim, affirm the order denying BOA's motion for summary disposition concerning its breach of contract claim, affirm the order granting summary disposition to BOA regarding FNTIC's counterclaims and affirmative defenses, and remand for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. BOA, as the prevailing party, may tax costs pursuant to MCR 7.219.

/s/ Patrick M. Meter
/s/ Douglas B. Shapiro
/s/ Colleen A. O'Brien

-23-